OPINION OF THE COURT
Seymour Schwartz, J.
Petitioner, the Attorney-General of the State of New York, seeks a permanent injunction enjoining respondents from violating subdivision 12 of section 63 of the Executive Law, claiming fraud in seeking church-related charitable exemptions, article 23-A of the General Business Law, claiming an unlawful pyramid scheme and article 15 of the Judiciary Law, claiming the unlawful practice of law. Petitioner also seeks restitution of the sums paid to respondents.
*953 A preliminary injunction was issued by the Honorable Herman Cahn on August 6, 1980 and an order entered thereon on August 12, 1980. That order enjoined respondents from (1) accepting payment as compensation for selling ministers’ credentials; (2) compensating affiliated or nonaffiliated institutions for the recruitment of ministers if such compensation were based on the number of ministers ordained; and (3) stating the tax consequences of becoming a minister or starting a church unless such tax consequences were in the form of a written opinion furnished by an attorney or certified public accountant.
On October 6,1980, petitioner received a complaint that respondent Life Science Church was continuing to sell ministers’ credentials and was still disseminating tax advice in violation of the August 12 injunction. Petitioner instituted an investigation and on October 17,1980 filed a motion to punish respondents for civil and criminal contempt. The proceedings were referred to this court for trial.
Petitioner does not seek to enjoin the right of the Life Science Church to practice its religion. At trial petitioner conceded the right of the Life Science Church to maintain its theology and teachings. “The basic doctrines, principles and beliefs held as ‘truth’ of the Life Science Church are The Declaration of Independence and The Constitution of the United States. (The 16th and 25th Amendments are not included in the Doctrines of the Life Science Church.)” The Attorney-General seeks to enjoin only those practices not protected by the Constitution and statutes and which are violative of laws applicable to all individuals, groups, organizations and institutions in our society.
At trial the Attorney-General presented the testimony of its Investigator Edward Martinez who attended a Freedom Foundation tax seminar on January 31, 1980 and subsequently became an ordained minister in the Life Science Church. Mr. Martinez testified that at the introductory seminar he was given instruction by respondents Frank Petrozza, Rick Ross, and James Rotollo. He also viewed a film on tax strategies featuring William Drexler, archbishop of the Life Science Church and a disbarred attorney who was recently convicted of tax violations in connection with misrepresentation of the tax laws as a sales pitch in *954 the sale of ministries in the Life Science Church. Martinez’ instructors explained how by joining the church he could become completely and legally tax free while at the same time maintaining his secular employment. The church guaranteed to back its members legally and financially if challenged by any government authorities. Tax exemption was to be obtained after paying $3,500 for minister’s credentials and attendance at three training sessions of the Life Science College. Once full payment was made the minister would name and establish his own church chartered by the Life Science Church. He then could either make donations to his church or take a vow of poverty placing all his property in the name of his particular church and then pay for all personal and family expenses through the church account, thereby avoiding all taxes. To encourage prospects to join quickly they were informed that the $3,500 payment would rise $100 in each succeeding month. They were urged to be wise and affiliate immediately before having to make higher payments.
Respondents Petrozza and Rotollo informed Investigator Martinez that he would receive a 10% commission on payments made by any new minister he recruited into the church.
The first session attended by Investigator Martinez was a class in preparing Federal and State income tax returns taught by respondent Bernice Gross with the assistance of respondents Howard Tapen, Frank Petrozza, and Larry Ranucci. At this session he learned that respondent Howard Tapen was the New York area director of the Life Science Church and that Tapen was to be contacted for legal advice and consultation but by appointment only.
The second training session attended by Investigator Martinez was devoted to drafting church by-laws, a constitution, and trust agreements. Joseph Dalconzo taught the class aided by Carmine D’Onofrio and respondent Annette Schack.
On February 23, 1980, Investigator Martinez completed his payment to Howard Tapen for his minister’s credentials. Being paid up and now a minister, he was instructed to attend a meeting of supervisors for his third college *955 training session. That meeting was conducted by Messrs. Tapen, Dalconzo and Ranucci. Mr. Dalconzo and Mr. Tapen described the new chain of command in the church and the necessity of using church terms, not business terms. The ministers were informed that Frank Ebner as legal counsel would deal with ministers’ problems with banks and real property tax. Mr. Ranucci then described how a Life Science Church minister could become a millionaire in one year by recruiting new ministers, who in turn would recruit new ministers thereby receiving commissions on all recruitments at an ever increasing level which would make him a millionaire.
On March 27, 1980 Investigator Martinez received his formal minister’s credentials and on March 31, 1980 a Doctor of Divinity degree from the Life Science Church.
Joseph Dalconzo testified that he was introduced to the Life Science Church by Larry Ranucci. It was agreed that Dalconzo would become a director of the Life Science Church upon payment of $10,000 and would have his own organization. An agreement was drafted and executed by Dalconzo and Ranucci incorporating those terms. Dalconzo then proceeded to attend meetings and recruit ministers. During his involvement with the church, Dalconzo was made aware that Ranucci was bishop of the New York area, William Drexler, archbishop, and Ebner and Tapen, acting bishops. Petrozza and Dalconzo were directors with each responsible for his own organization.
Through Ranucci, Dalconzo learned the details of the church’s marketing program. A minister who recruited another was a “missionary representative” and received a 10% commission on each recruit’s payment. After recruiting two ministers in one month he became a “missionary supervisor”. After the first two recruits the commission rose to $500 for each recruit. As a director, Dalconzo received 40% of the money paid by those he recruited. Dalconzo testified that during his six months in the Life Science Church he recruited 20 people and received approximately $95,000. To avoid disputes a grievance committee was set up to deal with problems concerning the division of commissions.
*956 Other testimony and evidence confirmed the testimony of Investigator Martinez and Joseph G. Dalconzo as to the operations of the Life Science Church, the recruitment of ministers, the theme on how to become a millionaire, promises of tax exemption and the legal backing the church would provide for its ministers.
Respondents rested without producing any witnesses. They also failed to produce certain subpoenaed documents and from this failure the court has drawn inferences further supporting petitioner’s version of the operations of the church.
The Attorney-General challenges the Life Science Church’s claim of complete legal tax exemption through the purchase of minister’s credentials, that churches cannot be audited or questioned by the Internal Revenue Service, that churches are automatically exempt from taxation, that the burden is on the Internal Revenue Service to establish that a church is not entitled to exempt status, that ministers under a vow of poverty pay no taxes and that money given to any church is tax deductible. It denies that a minister may keep his job and donate up to 50% of his income to his own named church made up of himself, his spouse and children and be entitled to a charitable contribution deduction and thereby substantially reduce his tax obligations. It challenges the alternative procedure offered that a minister taking a vow of poverty to his church will eliminate his tax liability entirely. Under the vow of poverty procedure a minister would claim authority to expend church funds for his family’s food, clothing, shelter, personal expenses and even for spiritual retreats to Las Vegas. The record is abundantly clear that all of these assertions were made by responsible representatives of the Life Science Church in their efforts to recruit new ministers.
The Attorney-General contends that the tax benefits claimed by the Life Science Church in setting up separate subsidiary churches are fraudulent and misleading and are in violation of subdivision 12 of section 63 of the Executive Law.
The income tax system of the United States — the envy of almost every government in the world — depends on *957 voluntary compliance by taxpayers who are called upon to compute and fix their own tax. Fewer than 2% of Federal income tax returns are audited. For such a voluntary system to be successful, taxpayers must believe that it is essentially fair in operation and that the burden of taxation is equitably spread. If this self-discipline is to be maintained improper exemptions must be ferreted out and denied because it is impossible for the government to collect income taxes through audit alone and the very structure of organized government may be undermined.
Witnesses presented by the Attorney-General included some of the Nation’s leading tax experts: Jerome Kurtz, former Commissioner of the Internal Revenue Service; Father Charles Whelan, professor of law, Fordham University Law School, an expert on church tax exemptions; Stanley Weithorn, author of a definitive treatise on tax exempt organizations and Howard Schoenfeld, special assistant to the assistant commissioner for exempt organizations of the Internal Revenue Service. Their testimony aided the court in focusing on the tax exemption issues presented.
Taxation of religious organizations is constitutionally permissible under the free exercise of religion clause of the First Amendment to the Constitution. (Watchtower Bible & Tract Soc. v County of Los Angeles, 30 Cal 2d 426, cert den 332 US 811; Ham Evangelistic Assn, v Matthews, 300 Ky 402.) It follows that church property is taxable except as it may be specifically exempted by statutory enactment. The issue then is not one of constitutional dimension but whether an individual or organization claiming religious exemption qualifies under applicable statutes.
For a church to receive the benefit of tax exemption, it must satisfy the requirements of section 501 (subd [c], par [3]) of the Internal Revenue Code. This section requires that:
(1) It is organized and operated exclusively for charitable purposes;
(2) No part of its earnings inure to the benefit of a private individual or shareholder;
*958 (3) The organization does not substantially engage in attempts to influence legislation and does not intervene in political campaigns.
Failure to satisfy any one of the requirements set forth in section 501 (subd [c], par [3]) is fatal and will destroy tax exempt status. (Stevens Bros. Foundation v Commissioner of Internal Revenue, 324 F2d 633, cert den 376 US 969.)
In addition, to receive the benefit of tax exempt status two further requirements have been read into section 501 (subd [c], par [3]). The organization must be formed for a public as opposed to a private purpose, and the activities of the organization must be in conformity with well-defined public policy.
The subsidiary churches sanctioned by Life Science Church operate in whole or in part for the private purposes of the respective ministers and their families and thereby violate both the inurement and operational requirements of section 501 (subd [c], par [3]). The courts have held that a single substantial nonreligious purpose precludes exempt status. (Parker v Commissioner of Internal Revenue, 365 F2d 792; American Inst, for Economic Research v United States, 302 F2d 934.)
An organization is not operated exclusively for one or more exempt purposes if its earnings inure in whole or in part to the benefit of private shareholders or individuals. (Treasury Reg, § 1.501 [c] [3]-l [c] [2]; 26 CFR 1.501 [c] [3]-1 [c] [2].)
In Calvin K. of Oakknoll v Commissioner (69 TC 770, 37 TCM 1380, affd 79-1 USTC, par 9328), the United States Court of Appeals for the Second Circuit, affirmed on the opinion below of the Tax Court which held that the “Religious Society of Families” was not operated exclusively for religious purposes and consequently contributions to the organization were not deductible for tax purposes. The Tax Court stated (37 TCM, at pp 138Í-1382): “[N]o one besides petitioners benefited from the use of Society property. Petitioners alone had signature authority over the Society’s checking account * * * By providing for petitioner’s personal needs, the Society had a ‘non-charitable purpose substantial in nature.’ * * * We conclude, therefore, that *959 the Society was not operated exclusively for the specified purposes.”
Private inurement is also proscribed by section 170 (subd [c], par [2], cl [C]) of the Internal Revenue Code and thereby disqualifies a minister’s gift to his church from being considered a charitable contribution. While the evidence is sparse, the best that can be said is that less than 5% of Life Science Church funds go to charity and unless a minister can establish that there has been no private benefit or inurement to him, the church does not qualify as tax exempt and contributions are not deductible.
The United States Tax Court has consistently upheld the Internal Revenue Service’s position of disallowing charitable deductions for donations taxpayers make to churches they establish which operate for the benefit of their founders. (Basic Bible Church v Commissioner, 74 TC 846 [1980]; Lynch v Commissioner, 41 TCM 204; Abney v Commissioner, 39 TCM 965; Pusch v Commissioner, 39 TCM 838, affd 628 F2d 1353; Walker v Commissioner, 37 TCM 1851-15; Calvin K. of Oakknoll v Commissioner, 37 TCM 1380, supra; Heller v Commissioner, 37 TCM 643; Clippinger v Commissioner, 37 TCM 484; Revenue Rule 78-232, 1978-1 CB 69.)
In addition to requiring that a church meet the requirement of section 501 (subd [c], par [3]), section 170 requires that a “donation” must qualify as a charitable contribution within the meaning of the code. Consequently, where the donor expects to obtain a commensurate benefit, deductions are disallowed. A charitable contribution is synonymous with a gift. (DeJong v Commissioner of Internal Revenue, 36 TC 896, 899, affd 309 F2d 373; Channing v United States, 4 F Supp 33, affd 67 F2d 986, cert den 291 US 686.) If the benefits that the transferor can reasonably expect to obtain by making the transfer are sufficiently substantial to provide a quid pro quo, no deduction under section 170 is allowed. (Revenue Rule 78-232, 72-506.) Here, Life Science ministers anticipated and received direct economic benefits from their payments to their church. Accordingly, their payments were not “gifts” within the meaning of section 170 and were not deductible contributions.
*960 Religious officials are required to pay income tax on earnings. An individual is not relieved of Federal income tax liability on income earned by merely assigning his income to a church. Nor does a vow of proverty grant automatic immunity from Federal income tax. For a vow of poverty to be effective, and an exemption to accrue, the member of the religious order must receive the income as an agent of the order and remit the income to the order where the funds will be treated as the income of the order and not the member. (Revenue Rule 77-290, 76-323; Francis E. Kelly, 62 TC 131.)
Where there is a vow of poverty, an agency relationship must be established in which the employer looks directly to the order, not the individual member, for performance of services. Therefore, for a vow of poverty to have exemptive tax consequences, the church must be exempt under section 501 (subd [c], par [3]), the minister must be an agent, not a principal of the church, and the activities performed by the minister agent must be in furtherance of the exempt purposes of the church. Judged by this standard, a minister of the Life Science Church who maintains his regular secular employment and takes a vow of poverty does not secure an income tax exemption.
Life Science Church’s contention that it cannot be audited by the Internal Revenue Service is wrong. The Internal Revenue Service is specifically authorized to audit churches in certain circumstances. (Internal Revenue Code [US Code, tit 26, § 7605, subd (c)].) In amplification, Treasury Regulation 1.6033-2 (a) (2) provides that every organization exempt from tax shall submit such additional information as may be required by the Internal Revenue Service to ascertain the basis of its exempt status and to administer the provisions of section 501 and the subsequent code sections.
The burden of proof is on the organization seeking to obtain tax exempt status. An exemption is an exception to the norm of taxation. An organization which seeks to obtain tax exempt status, therefore bears a heavy burden to prove that it satisfies all the requirements of the exemption statute. The Supreme Court repeatedly has said that exemptions from taxation are not granted by implication. *961 (See, e.g., Mescalero Apache Tribe v Jones, 411 US 145, 156, and authorities therein cited; Harding Hosp. v United States, 505 F2d 1068.)
In addition, respondents introduced into evidence a purported exemption letter from the Internal Revenue Service (respondents’ “T” in evidence) which had the earmarks of forgery. It was disavowed by Commissioner Kurtz, Mr. Schoenfeld and Father Whelan and respondents were unable to offer any proof of its authenticity. The parties then stipulated that the Life Science Church never received an exemption from the Internal Revenue Service. There was also compelling testimony that the Internal Revenue Service would not grant an exemption to the Life Science Church.
The representations made by Life Science Church through its responsible agents and its publications claiming charitable exemptions were repeatedly stated and emphasized at meetings. They were in error and are fraudulent and deceptive practices in violation of subdivision 12 of section 63 of the Executive Law.
Section 359-fff of the General Business Law of the State of New York provides:
“Chain distributor schemes prohibited
“1. It shall be illegal and prohibited for any person, partnership, corporation, trust or association, or any agent of employee thereof, to promote, offer or grant participation in a chain distributor scheme.
“2. As used herein, a ‘chain distributor scheme’ is a sales device whereby a person, upon condition that he make an investment, is granted a license or right to solicit or recruit for profit or economic gain one or more additional persons who are also granted such license or right upon condition of making an investment and may further perpetuate the chain of persons who are granted such license or right upon such condition. A limitation as to the number of persons who may participate, or the presence of additional conditions affecting eligibility for such license or right to recruit or solicit or the receipt of profits therefrom, does not change the identity of the scheme as a chain distributor scheme. As used herein, ‘investment’ means any acquisi *962 tian, for a consideration other than personal services, of property, tangible or intangible, and includes without limitation, franchises, business opportunities and services. It does not include sales demonstration equipment and materials furnished at cost for use in making sales and not for resale.
“3. A chain distributor scheme shall constitute a security within the meaning of this article and shall be subject to all of the provisions of this article.”
The legislative history of section 359-fff states its goals (Memorandum of Attorney-General, NY Legis Ann, 1974, pp 78-79): “[T]he chain distributor scheme is an improvident promotion designed to lure persons in the lower income brackets, the young, the gullible, the unemployed or other persons in desperate need of a source of income into believing that through the magic of the chain distributor scheme, they can become one of the top two or three percent of the money earners in this country. Such representations usually result in a total financial loss to a person joining the chain distributor scheme. However, because the people to whom this approach is made often are easily led to believe that by such fanciful ventures they can escape from their current predicaments, it is imperative that legislation prohibiting such schemes be enacted as soon as possible to remove such schemes that prey on the unwary.”
The Life Science Church promised return of the $3,500 or $3,600 payment to a prospective minister, and an even larger cash return if sufficient new ministers were received through him. A new member of the Life Science Church was given the right to act as “missionary representative” and was entitled to a 10% commission for each new member he recruited into the church. After recruiting two fully paid members in one month, the “missionary representative” was granted advancement to the “missionary supervision” level and thereby became eligible to receive a special bonus of $500 for each new fully paid minister recruited. After the “missionary supervision” level, one could become a director, and, like Director Dalconzo, receive 40% of all fees from the ministers brought in.
*963 Ministers were enticed through a demonstration of number doubling. Two became 4, 8 became 16, 32 became 64, etc., and commissions mounted from $360 to a total of $1,023,500 when 2,047 new recruits were added. A chart was prepared to give dramatic visual impact on how to become a millionaire and member ministers were encouraged to join in a vocal “money humm” at meetings to raise morale and encourage a financial spirit. Computerized “family trees” were prepared to determine who was entitled to what proportion of a new minister’s payment. A grievance committee was set up to resolve disputes.
Variations on the theme were possible. The contract executed by Dalconzo and Ranucci provided for a 40% commission to Dalconzo for bringing in new ministers. Under the contract, Dalconzo received $95,000 by bringing in 20 ministers.
Under subdivision 12 of section 63 of the Executive Law of the State of New York, the Attorney-General is authorized to seek and obtain restraining orders and restitution against corporations and individuals who have engaged in repeated or persistent fraudulent or illegal business practices. “Fraud” and “fraudulent” have been defined to include acts and practices having the capacity or tendency to deceive the public even where there is no actual intent to deceive. (Matter of Lefkowitz v Bull Inv. Group, 46 AD2d 25.)
The evidence conclusively demonstrates a pyramid scheme in violation of section 359-fff of the General Business Law for which the Attorney-General is entitled to a restraining order and restitution to those affected.
Section 478 of the Judiciary Law prohibits the unauthorized practice of law. The section provides: “It shall be unlawful for any natural person to practice or appear as an attorney-at-law or as an attorney and counselor-at-law for a person other than himself in a court of record in this state or in any court in the city of New York, or to furnish attorneys or counsel or an attorney and counsel to render legal services, or to hold himself out to the public as being entitled to practice law as aforesaid, or in any other manner, or to assume to be an attorney or counselor-at-law, or *964 to assume, use, or advertise the title of lawyer, or attorney and counselor-at-law, or attorney-at-law or counselor-at-law, or attorney, or counselor, or attorney and counselor, or equivalent terms in any language, in such manner as to convey the impression that he is a legal practitioner of law or in any manner to advertise that he either alone or together with any other persons or person has, owns, conducts or maintains a law office or law and collection office, or office of any kind for the practice of law, without having first been duly and regularly licensed and admitted to practice law in the courts of record of this state, and without having taken the constitutional oath and without having subscribed and taken the oath or affirmation required by section four hundred sixty-eight of the judiciary law and filed the same in the office of the clerk of the court of appeals as required by said section.”
Section 495 of the Judiciary Law prohibits corporations or voluntary associations from practicing law.
Ministers were informed at meetings that Dr. Howard Tapen would provide legal advice. Dr. Tapen was not a lawyer. Ministers were discouraged from going to an outside attorney for advice on church business. Jack Tizzio was informed that the payment he made to become a minister was in part to cover the costs of the legal and financial backing that the church offered.
A film shown to prospective ministers introduced William E. Drexler, “the greatest tax attorney in this country”, who spoke on the Life Science Church and encouraged membership. Mr. Drexler was disbarred by the State of Minnesota from practicing law and was recently convicted in California for misrepresenting the tax laws in order to sell ministries in the Life Science Church.
The promise to provide legal advice in the future is the unauthorized practice of law. (People v Alfani, 227 NY 334.) Holding oneself out to the public as being capable of giving legal advice is improper. (People v People’s Trust Co., 180 App Div 494.) Mr. Ebner and Mr. Tapen were not attorneys, yet they were referred to as “legal advisors” of the Life Science Church to whom ministers were to go for advice.
*965 Matter of New York County Lawyers’ Assn, v Dacey (28 AD2d 161, revd 21 NY2d 694) which held that defendant’s book, which included forms of wills, inter vivas trusts and other related documents, was not the practice of law, is distinguishable. There it was held (28 AD2d, at p 174 [dissenting opn]) that the book did not involve “the representation and the advising of a particular person in a particular situation”. Here, however, personalized and particular tax and organization advice to individuals and groups and the offer of future legal advice bring church conduct out of the Dacey holding. Prospective ministers were assured that they would be backed legally and financially by the Life Science Church. Instructions were tailored to suit the needs of each minister to obtain income tax exemption.
In its totality, the conduct constitutes the unauthorized practice of law in violation of section 478 of the Judiciary Law and subdivision 12 of section 63 of the Executive Law. These representations not only had the capacity to deceive, but in fact did deceive. (People v Federated Radio Corp., 244 NY 33; Matter of State of New York v Colorado State Christian Coll, of Church of Inner Power, 76 Misc 2d 50.)
Section 224 of the Education Law provides: “1. No individual, association, copartnership or corporation not holding university, college or other degree conferring powers by special charter from the legislature of this state or from the regents, shall confer any degree or use, advertise or transact business under the name university or college, or any name, title or descriptive material indicating or tending to imply that said individual, association, copartnership or corporation conducts, carries on, or is a school of law, medicine, dentistry, pharmacy, veterinary medicine, nursing, optometry, podiatry, architecture or engineering, unless the right to do so shall have been granted by the regents in writing under their seal.”
The parties stipulated at trial that the Life Science Church never filed an application with the Department of Education. The Life Science Church, nevertheless, held itself out as the Life Science College. Prospective ministers were told to attend “college classes” of the church. Even if the Life Science College were authorized to exist in *966 another State, the Director of Program Review of the New York State Department of Education testified, it would be necessary to file with the State of New York to obtain authority. This was never done. By using the word “college” respondents violated section 224 of the Education Law.
Respondents raise the defense of First Amendment free exercise of religion to the charges brought against them. It bears repetition that petitioner does not seek to enjoin the religious beliefs of the church. Regardless of this litigation, it may continue to follow those religious beliefs and adhere to its theology.
In United States v Lee (_US_, 50 USLW 4201) the Supreme Court of the United States reiterated that not all burdens on religion are unconstitutional and that the State may justify a limitation on religious liberty by showing that it is essential to accomplish an overriding governmental interest.
Tension between these two great principles does not automatically mean violation of the free exercise of religion clause of the First Amendment to the Constitution of the United States. The problem is an ancient one and with near unanimity our civilization has sought its solution in “Render therefore unto Caesar the things that are Caesar’s; and unto God the things that are God’s.” (St. Matthew, ch 22, verse 21.)
Respondent Petrozza informed prospective ministers that he would show them how to become tax exempt and that he was talking of a legal fiction as opposed to a religious church. He warned prospective ministers not to admit to anyone that they became ministers to achieve tax exemption. Mr. Dalconzo testified that members need not separate themselves from their original church to become members of the Life Science Church. From Life Science’s perspective they could conscientiously belong to the two churches. Prospects were told that they would be taught how to become millionaires, that the word “selling” was simply another word for “fund raising” and that “missionary program” was a synonym for “marketing”. Members were warned that the purpose of making money through *967 the church should be expressed within the confines of the church but not “out there”. The produce was described as “money”.
The First Amendment free exercise of religion clause of the Constitution is not a license for unrestricted conduct. Freedom to believe is absolute but courts may restrict acts and conduct if the intrusion is justified by a compelling State interest to protect society and maintain peace, order and morality. (Reynolds v United States, 98 US 145; Davis v Beason, 133 US 333; Jacobson v Massachusetts, 197 US 11.) The courts have established a balancing test between the free exercise of religion and the State’s interest in protecting the public. In Cantwell v Connecticut (310 US 296, 303-304) the Supreme Court of the United States stated: “[T]he Amendment embraces two concepts — freedom to believe and freedom to act. The first is absolute but, in the nature of things, the second cannot be. Conduct remains subject to regulation for the protection of society. The freedom to act must have appropriate definition to preserve the enforcement of that protection. In every case the power to regulate must be exercised as not, in attaining a permissible end, unduly to infringe the protected freedom”.
In United States v Lee (_US_., _, 50 USLW 4201, 4202, supra), the Supreme Court reviewed the long established analysis: “[N]ot all burdens on religion are unconstitutional.” (See, e.g., Prince v Massachusetts, 321 US 158; Reynolds v United States, 98 US 145.) “The state may justify a limitation on religious liberty by showing that it is essential to accomplish an overriding governmental interest.” (Thomas v Collins, 323 US 516; Wisconsin v Yoder, 406 US 205; Gillette v United States, 401 US 437; Sherbert v Verner, 374 US 398.)
In Matter of Holy Spirit Assn, for Unification of World Christianity v Tax Comm, of City of N. Y. (81 AD2d 64, 75, 79) the Appellate Division, First Department, demonstrated the detailed analysis that may be made into , the conduct of a religious organization by the State as the protector of society and denied the Unification Church an exemption from the real property tax stating:
*968 “Therefore, despite the religious content of the doctrine, and the leitmotif of religion with which the eclectic teachings are tinged, the doctrine, to the extent that it analyzes and instructs on politics and economics has substantial secular elements. The mere use of religious terminology in connection with politics and economics will not obscure the traditionally non-religious nature of these fields. Petitioner, by undertaking an adventure in semantics, is attempting to cloak politics and economics with the blanket of religious dogma * * *
“By denying petitioner tax exemption, this court is not limiting petitioner’s freedom to practice its beliefs and disseminate its doctrines; rather, it is merely declaring that petitioner is not organized and conducted in the manner required by law to entitle it to a tax exemption.”
Held to these standards the claim of free exercise of religion is not a shield to an unlawful claim of tax exemption, an illegal pyramid scheme, improper holding out as an attorney and misuse of the term “college”.
Respondents contend that certain collaboration between petitioner’s office and the District Attorney of Nassau County taint a portion of the evidence and for that reason the proceeding should be dismissed.
The record reveals that Investigator Martinez held three meetings with the Nassau County District Attorney’s office and that Assistant Attorneys-General Siegel-Baum and Weidman were deputized by the District Attorney of Nassau County but did not actually act in that capacity. There was no evidence of a parallel or joint plan by the Attorney-General and District Attorney to investigate the Life Science Church and respondents. In any event joint investigations are not unknown. It is only when such an investigation is carried on by one arm of government entitled to do so on behalf of another arm of government not entitled to do so that such investigation is improper. The only claim of impropriety by respondents is to be found in petitioner’s Exhibit No. 50, the contract entered into between Ranucci and Dalconzo. Respondents contend that this contract was illegally given to the Attorney-General’s office by Dalconzo’s attorney who had lawfully secured it from the District Attorney.
*969 The testimony established that because of the inconvenience to many of the respondents in having their documents tied up by the District Attorney, some were returned to them, including the Ranucci-Dalconzo contract. Dalconzo’s attorney was one of many attorneys given access to the documents subpoenaed by the District Attorney. Dalconzo was entitled to his contract. It had been executed by him and having properly obtained it through his attorney, as other respondents had obtained their documents, he was free to make it available to the Attorney-General. Further, the claim of taint, even if successful, would only eliminate petitioner’s “50” in evidence, the written contract. The contents of the contract were testified to orally by Dalconzo at trial and this, together with the other evidence, was sufficient to demonstrate the pyramid scheme.
As previously stated Judge Cahn enjoined respondents from (1) accepting payment as compensation for selling ministers’ credentials; (2) compensating affiliated or nonaffiliated institutions for the recruitment of ministers ordained; and (3) stating the tax consequences of becoming a minister or starting a church unless such tax consequences were in the form of a written opinion furnished by an attorney or certified public accountant. Respondent flagrantly disregarded this order.
On October 7, 1980 Investigator Michael A. Segarra attended a Freedom Foundation seminar at the Taft Hotel. The meeting was conducted by Anthony Rousseau, who discussed the tax consequences of becoming a minister and solicited sales of ministers’ credentials. He made it clear that no credentials would be issued until the entire donation had been paid. He falsely advised the audience that the court’s injunction had been lifted against the church and its leaders. The May edition of Good News, a church newspaper, was given to Investigator Segarra together with another document which furnished written advice on the tax consequences of becoming a minister.
These acts constituted criminal contempt pursuant to section 750 of the Judiciary Law in that they were in willful disobedience of the court’s lawful mandate. While at least 24 seminars were conducted since Judge Cahn’s order, evidence is only available for that single seminar. *970 The Life Science Church is fined the sum of $10,000 for criminal contempt for violating the restraining order.
Section 773 of the Judiciary Law provides for a fine for civil contempt. It states that if “actual loss or injury has been caused to a party * * * by reason of the misconduct proved against the offender * * * a fine, sufficient to indemnify the aggrieved party, must be imposed * * * and paid over to the aggrieved party”. The aggrieved parties are those individuals who were purchasers of ministers’ credentials whom Justice Cahn sought to protect in his order and the actual loss to each party is the payment made in exchange for those credentials. The payments made after August 12, 1980 should be returned to the purchasers as fines because they are defrauded consumers. (State of New York v Unique Ideas, 44 NY2d 345.)
The petition is dismissed against respondents Donna Petrozza, and Lorraine Jania for petitioner’s failure to make out a prima facie case against them. Lee Hirsch and Joseph G. Dalconzo are removed as respondents upon consent of petitioner.
The remaining respondents are permanently enjoined from directly, or indirectly engaging in the following illegal, fraudulent and deceptive acts:
(1) Soliciting funds from the public for ministers’ credentials.
(2) Selling or offering to sell ministers’ credentials.
(3) Engaging or attempting to engage in a chain distribution scheme as defined in section 359-fff of the General Business Law.
(4) Engaging or aiding anyone in engaging in the unauthorized practice of law.
(5) Continuing to use the name “college” unless and until proper authorization is obtained from the appropriate State agency.
A permanent receiver shall be appointed pursuant to section 353-a of the General Business Law, who shall have all the authority provided by statute, including but not limited to:
*971 (1) Establishment of a fund for restitution to be maintained for a period of no less than two years from the time established and which time may be extended if circumstances warrant.
(2) The receiver shall account to the court with notice to the Attorney-General every six months during the existence of the fund.
(3) Notice shall be given to victimized consumers in the following manner:
(a) Publication for no less than three consecutive weeks in a paper of general circulation in each county in New York and in Nassau and Suffolk counties;
(b) Individual notice shall be sent to each consumer who purchased credentials from Life Science Church. Respondents’ attorney shall provide the petitioner with an affidavit stating the names of purchasers, contents of the notice and date of the mailing;
(c) The contents of said notices (newspaper and by letter) shall be submitted to the Attorney-General for approval as to form and substance prior to mailing.
Pursuant to CPLR 8303 (subd [a], par 6), subdivision 12 of section 63 of the Executive Law, and subdivision 1 of section 353 of the General Business Law, petitioner is awarded a sum for costs directly attributable to the prosecution of this action, which it may establish by affidavit upon the settlement of order.