782 F.2d 1120
 57 A.F.T.R.2d 86-759, 86-1 USTC P 9215,
19 Fed. R. Evid. Serv. 1488
 UNITED STATES of America, Appellee,
v.
Frank V. EBNER, Frank T. Petrozza, Joseph S. Rodi, Lorraine
C. Schneider a/k/a/ "Lorraine C. Jania", Lawrence
Ranucci, Howard G. Tapen, Jr.,
Defendants-Appellants.
 Nos. 465, 466, 495, 496, 497, 498, Dockets 85-1280 to
85-1283, 85-1302, 85-1338.
 United States Court of Appeals,
Second Circuit.
 Argued Nov. 19, 1985.
Decided Jan. 29, 1986.
 
 Martin L. Perschetz, Asst. U.S. Atty. (Rudolph W. Giuliani, U.S. Atty. for the S.D. of N.Y., Mary T. Shannon, Stuart E. Abrams, Asst. U.S. Attys., New York City, for appellee.
 Barry M. Fallick, New York City (Rochman, Platzer & Fallick, New York City, of counsel), for defendants-appellants Lawrence Ranucci and Joseph S. Rodi.
 Frank V. Ebner, Valley Stream, N.Y., pro se.
 Eric Greenbush, New York City for defendant-appellant Howard G. Tapen, Jr.
 Philip Katowitz, Brooklyn, N.Y., for defendant-appellant Frank T. Petrozza.
 H. Howard Friedman, New York City, for defendant-appellant Lorraine C. Schneider.
 Before FEINBERG, Chief Judge, LUMBARD and OAKES, Circuit Judges.
 LUMBARD, Circuit Judge:
 
 
 1
 Frank Ebner, Frank Petrozza, Joseph Rodi, Lorraine Schneider, a/k/a "Lorraine C. Jania," Larry Ranucci, and Howard Tapen, Jr. appeal from judgments of conviction entered in July and August, 1985, in the Southern District, following a two-month trial before Judge Vincent L. Broderick and a jury. The indictment charged 15 counts against all the appellants as well as Donna Petrozza, Frank Petrozza's wife. The indictment charged the defendants with conspiracy to defraud the United States, in violation of 18 U.S.C. Sec. 371, and with individual income tax evasion, in violation of 26 U.S.C. Sec. 7201.
 
 
 2
 The appellants all argue, first, that the district court abused its discretion by receiving into evidence portions of a New York State Supreme Court opinion enjoining defendants from continuing to implement the tax avoidance scheme that was the subject of the federal indictment; they claim that the jury understood that evidence to be an authoritative statement of their guilt. Second, appellant Ebner argues that, as a result of several evidentiary decisions and the court's charge, he was denied a fair trial. Third, appellant Schneider contends that the evidence was insufficient to show that she committed affirmative acts of tax evasion, and thus, under Spies v. United States, 317 U.S. 492, 63 S.Ct. 364, 87 L.Ed. 418 (1943), her conviction cannot stand. Finally, appellant Tapen argues that Judge Broderick abused his discretion by denying Tapen's pretrial motion for a severance under Fed.R.Crim.P. 14, and that this denial unfairly prejudiced him. We find these arguments to be without merit.
 
 
 3
 The appellants' tax-evasion scheme centered around a bogus religious organization called the Life Science Church ("LSC"). The proof at trial showed that the defendants, on the basis of sham "vows of poverty" taken as LSC "ministers," followed by the assignment of income to their own personal "churches," paid no income taxes on over $3,660,000 of taxable income derived primarily from the marketing and sale to the public of LSC "ministries".
 
 
 4
 Ranucci and his co-defendants became associated in 1977, when Ranucci and his partner, Reichert, formed U.N.I. Vending, a Long Island company engaged in the sale and distribution of vending machines. Ebner and Tapen were U.N.I. commissioned salesmen; Frank and Donna Petrozza were independent distributors of U.N.I. Vending equipment; and Schneider, who is Ranucci's daughter, was U.N.I.'s bookkeeper.
 
 
 5
 Late in 1978, Ranucci was approached by William Drexler, who was the national head and "Archbishop" of LSC. Drexler, a former lawyer,[1] explained to Ranucci that a principal "belief" of LSC's was that Americans were overtaxed and had the right to choose not to pay taxes; he said that LSC marketed and sold "ministries" as a means of eliminating or substantially reducing a purchaser's income tax liability. Drexler offered to sell Ranucci and Reichert, for $60,000, an LSC "bishopship" covering New York State and New England, pursuant to which they would be enabled to sell "ministries" to the public for $3,000 each. They would retain $2,500 and then remit the balance of $500 to Drexler, who would supply a complete packet of credentials. These new "ministers" could in turn recruit other members of LSC, and receive commissions out of the $2,500 retained by the "bishops." Ranucci quickly agreed, paid Drexler the $60,000, and left U.N.I. Vending to work for the church full-time.[2] He headed the scheme in New York and New England, and was assisted in the New York area by his co-defendants. Ebner, Schneider, and Tapen also left U.N.I. to join LSC.
 
 
 6
 On December 22, 1978, Ranucci opened his first LSC "church" bank account in the name of the "Life Science Church", which only Ranucci could use in New York as the name for his own personal "church." One week later, he signed his LSC "vow of poverty," pledging to make an irrevocable gift to his "church" of all his present and future assets and income. The remaining defendants all opened their "church" bank accounts and took their LSC "vows of poverty" at different times in 1979. Each chose his or her own name for the personal "church"--for example, Howard Tapen, who owned an automobile transmission repair shop, became the "minister" of the "Church of Transmission."
 
 
 7
 The LSC scam was implemented in two ways. The more popular was the "vow of poverty" system, according to which a "minister" would transfer all his interest in present and future income and in material assets to his "church." The "minister" would close all of his personal bank accounts and open at least one checking account in the name of his church, over which the "minister" would exercise full control. The "minister's" personal expenses, which often included luxury items such as cars, boats, or, in Ranucci's case, a "baptismal" (swimming) pool in his backyard, were paid out of church funds and were characterized for tax purposes as authorized expenses of a tax-exempt "church" for the support of its "minister" and to fulfill the "church's" religious and charitable purposes.
 
 
 8
 Another way to implement the scheme was called the "50% system." The "minister" would not take a vow of poverty, but would instead continue to maintain accounts and assets in his own name, and would not claim to have renounced his interest in his income. He would, however, open a bank account in the name of his LSC personal "church," and deposit into that account up to 50% of his adjusted gross income, which is the maximum amount permitted to be deducted as a charitable contribution under the I.R.C. The "minister" would continue to file tax returns, but would deduct all funds deposited into his "church" account, even though he retained complete control over them and used the funds to pay his personal expenses. Most new ministers chose the "vow of poverty" system because it resulted in greater tax savings and because the 50% system ran a greater risk of an income tax audit.
 
 
 9
 As area "bishop" in charge of all LSC operations in New York and New England, Ranucci controlled the bank accounts containing the membership fees paid by the new LSC "ministers," which were called "donations." Ranucci retained at least 60% of these fees; the remainder was paid out in commissions to the "missionaries" who recruited the new LSC ministers. In 1980, the "Bishop's Council" was formed--comprised of Ranucci, Ebner, the Petrozzas, Rodi, Schneider, and Ranucci's son, Larry Ranucci, Jr. From that point on, all membership fees were deposited into a bank account in the name of Life Science Church, N.A. ("LSCNA"), a partnership made up of the members of the Bishop's Council. Ranucci presided over the Bishop's Council, and as an LSCNA partner he received a 20% distributive share of its net profits after expenses.
 
 
 10
 Ebner, Petrozza, Rodi, Schneider, and Tapen all assisted Ranucci by recruiting and "training" new ministers; they received commissions in the form of "donations" from LSC to their individual auxiliary "churches." Upon formation of the Bishop's Council in 1980, all but Tapen became "Auxiliary Bishops" who, as LSCNA partners, were entitled to equal 20% shares of the partnership's net profits. From December 15, 1980, through November 25, 1981, over $2.1 million in cash was withdrawn from the LSCNA bank account and divided among the Auxiliary Bishops and Ranucci, Jr., who functioned as a messenger in withdrawing the cash from the LSCNA account.
 
 
 11
 Ranucci stopped paying taxes in the year 1978, writing on his return for that year that he had taken a vow of poverty and was exempt from federal taxes. He had not filed a tax return by the time of trial, even though he had earned $1,696,045.35 in taxable income in the years 1979-81, mainly from selling ministries. Ebner paid no federal income taxes for the years 1978 through 1983, even though he earned $656,156.88 in taxable income from selling ministries in the years 1979-81 alone. The Petrozzas filed no federal income tax returns and paid no federal income taxes for the years 1980 through 1983, even though they earned $590,576.62 in 1980 and 1981, primarily from the sale of LSC ministries. Schneider paid no federal income taxes for the years 1980-82, although she earned $293,496.03 of taxable income from the sale of LSC ministries in 1980 and 1981. Tapen filed joint tax returns with his wife in the years he was involved with LSC, but he omitted from their 1980 joint return $61,064.50 in taxable income from the sale of ministries.
 
 
 12
 While the defendants were reporting to the IRS that they were ministers living under "vows of poverty," they were enjoying their tax-free affluence. They used "church" funds to pay their daily expenses and to pay for Cadillacs, oceanfront homes, and boats, and also to establish bank accounts in other countries. All the expenditures were justified as necessary to the conduct of church business--for example, Ranucci spent $9,279 in cash for a Harley-Davidson motorcycle and sidecar, telling the dealer that the purpose was to "spread the word of God."
 
 
 13
 On May 20, 1980, the Attorney General of the State of New York commenced an action in Supreme Court to enjoin various subdivisions of LSC operating in the state. The action named twelve individual respondents, including Ranucci, Ebner, the Petrozzas, Schneider, and Tapen. The verified petition alleged that LSC was defrauding the public by promoting the tax advantages of LSC "ministries," by operating an unlawful pyramid scheme, and by practicing law without a license. The Attorney General obtained a temporary restraining order prohibiting, inter alia, sale of "minister's" credentials, as well as removal, withdrawal, or disposition of any funds on deposit in the name of LSC, any individual respondent, or any LSC-chartered "church."
 
 
 14
 On August 8, 1980, the TRO was vacated and the freeze on "church" funds was lifted. In place of the TRO, the court substituted a preliminary injunction, prohibiting the respondents from 1) selling ministries, 2) compensating recruiters of ministers on a commission basis, or 3) stating the tax consequences of becoming a minister, unless it was in the form of a written opinion furnished by an attorney or a certified public accountant. In spite of this injunction, the defendants continued the three prohibited practices.[3]
 
 
 15
 After a month's trial during June, 1981, Justice Seymour Schwartz rendered an opinion on April 27, 1982, sustaining the petition against all the defendants except Schneider and Donna Petrozza. He held that the LSC "vow of poverty" system would not result in tax-exemption and that LSC "churches" were not tax-exempt under the I.R.C. On July 16, 1982, Justice Schwartz permanently enjoined the sale of LSC "ministries."
 
 
 16
 The first federal indictment against the defendants for individual tax evasion was filed in June, 1984. A superseding indictment was filed on March 15, 1985, and the federal trial commenced against all defendants on March 18, 1985.[4] The defense focused on whether the defendants acted willfully and with intent to violate the law, or whether they acted innocently in reliance on the advice of attorneys, other individuals, and various materials. The defense called three attorneys who had at one time or another performed legal services for LSC. The attorneys testified that they had given LSC advice in the structuring of the ministries, but they also testified that they never told the defendants that they were exempt from paying taxes on income earned in their individual capacities; or that the "churches" could be considered tax-exempt if it was found that they were organized for the purpose of tax avoidance; or that the "churches" could be tax-exempt if the defendants benefitted personally from the "churches' " net earnings.
 
 
 17
 Ebner, Petrozza, and Rodi took the stand and testified that they believed that their conduct was legal, based on statements made to them and on other materials. All three admitted, however, their knowledge that "ministers" who earned income in their individual capacities were liable for tax on that income, that "churches" could not be tax-exempt if organized for the purpose of tax avoidance, and that there was no exemption if any part of the churches' net earnings inured to their benefit. They acknowledged that no lawyer or other person had ever stated that the law was otherwise, and Ebner testified that he had informed every defendant of these principles.
 
 
 18
 Evidence also showed that various lawyers, including F. Lee Bailey, had informed the defendants on several occasions that the tax schemes were illegal. A lawyer named Louis Venezia told those assembled at a 1980 meeting, including Rodi, that the LSC tax program was a fraud that would not work, that Ranucci was a "con man" who had been involved in previous pyramid schemes, and that Ebner had been convicted twice of securities fraud.[5] Ranucci presented a brief defense, but did not testify. Schneider and Tapen presented no defense.
 
 
 19
 On May 23, 1985, the jury found Ranucci and Ebner guilty of conspiracy to defraud the United States, and all defendants guilty of tax evasion. All defendants received sentences of imprisonment, and all except Tapen were fined. Each defendant placed on probation was ordered, as a special condition, to resolve his or her tax liability with the I.R.S. and to make payments to the I.R.S. on a schedule to be set by the Probation Department.
 
 
 20
 The defendants argue that Judge Broderick abused his discretion by receiving into evidence portions of Justice Schwartz's opinion of April 27, 1982, in People v. Life Science Church, 113 Misc.2d 952, 450 N.Y.S.2d 664 (Sup.Ct.N.Y.Co.1982), appeal dismissed, 61 N.Y.2d 604, 473 N.Y.S.2d 1025, 462 N.E.2d 155 (1983), cert. denied, --- U.S. ----, 105 S.Ct. 97, 83 L.Ed.2d 42 (1984). They argue that the prejudicial effect of the evidence outweighed its probative value and that it should have been excluded under Fed.R.Evid. 403.
 
 
 21
 Judge Broderick allowed into evidence the legal analysis contained in Justice Schwartz's opinion because this analysis related to what appellants admit was the key issue in the case--whether they "willfully" evaded taxes.[6] Justice Schwartz's opinion clearly demonstrated that the defendants could not reasonably believe that the supposed tax benefits of an LSC "ministry" existed under the law. The opinion pointed out that to be tax-exempt, a church had to have been organized solely for religious or charitable purposes; that religious officials are required to pay income taxes on earnings just like everyone else; that a "vow of poverty" creates a tax exemption only if the member of the religious order receives income solely as a member of the order and remits his income to the order, and treats it as belonging to the order; that the employer paying wages must look to the order and not to the individual member of that order for the performance of services; and that the services performed must be in furtherance of an exempt purpose. Thus, the defendants had been given an authoritative statement of the requirements for tax exemption, and had been put on notice that LSC did not meet these requirements. This was strong proof to rebut defendants' contention that they did not knowingly do anything illegal and that they acted in accordance with advice from lawyers.[7]
 
 
 22
 Despite the clear relevance of the opinion, the defendants argue that its prejudicial nature outweighed its probative value. We disagree. The probative value of the opinion on the issue of the defendants' intent was clear. The district court acted well within its discretion in admitting the evidence. Judge Broderick gave the jury clear cautionary instructions before he received any of the evidence concerning the suit by the Attorney General. He emphasized that the state court opinion could be considered solely on the issue of intent and the degree to which the defendants had been placed on notice that their conduct was illegal. Such limiting instructions are " 'an accepted part of our present trial system,' " United States v. Siegel, 717 F.2d 9, 18 (2d Cir.1983), quoting United States v. Figueroa, 618 F.2d 934, 943 (2d Cir.1980), and consequently there is a "presumption that juries will follow [them]." Watkins v. Sowders, 449 U.S. 341, 347, 101 S.Ct. 654, 658, 66 L.Ed.2d 549 (1981).
 
 
 23
 Ebner argues that he was denied a fair trial. First, he argues that the court erred in admitting evidence of two prior convictions. Ebner had twice been convicted of securities fraud, once in New York State Supreme Court and once in the Southern District. The court made an on-the-record finding under Fed.R.Evid. 609(b) that the probative value of the convictions substantially outweighed their prejudicial effect. See United States v. Mahler, 579 F.2d 730, 734-36 (2d Cir.), cert. denied, 439 U.S. 991, 99 S.Ct. 592, 58 L.Ed.2d 666 (1978). Judge Broderick did not abuse his discretion. In admitting Ebner's New York State securities fraud conviction, he ruled that Ebner himself opened the door to the use of that conviction by denying, during his direct testimony and on cross-examination, that he was guilty of the federal offense and claiming that his federal guilty plea was the result of bad advice from lawyers and undue influence. The evidence of the state conviction served to impeach Ebner's testimony that his conduct in LSC and his prior federal conviction were attributable to advice he had received from lawyers. The remainder of Ebner's claims that he was denied a fair trial are without merit.
 
 
 24
 Schneider argues that her conviction should be set aside because there was no proof that she "filed" a "vow of poverty" with the I.R.S. Of course, it was not necessary to "file" the "vow" with the I.R.S. to implement the tax-evasion scheme, and none of the defendants did so. Nonetheless, Schneider argues that the proof was insufficient to establish an affirmative act of tax evasion necessary to satisfy the rule in Spies v. United States, 317 U.S. 492, 63 S.Ct. 364, 87 L.Ed. 418 (1943). Schneider's indictment, however, never alleged that she physically "filed" a "vow of poverty," nor was such an allegation necessary. To support the tax evasion convictions, the Government needed only to prove some affirmative act done to evade the tax; this can consist of "any conduct, the likely effect of which would be to mislead or conceal" taxable income. Id. at 499, 63 S.Ct. at 368. Schneider filed a false 1980 income tax return; she lived according to a sham "vow of poverty"; and she actively participated in and profited from the LSC pyramid scheme. The evidence amply demonstrated that the "likely effect" of such conduct was to mislead the Government and to conceal taxable income.
 
 
 25
 Finally, Tapen argues that Judge Broderick's denial of his pretrial motion for a severance under Fed.R.Crim.P. 14 was an abuse of discretion. He argues that severance should have been granted because he participated in the conspiracy for a shorter period of time than his co-defendants and was charged with failing to report less income than was charged against them. These differences did not require a severance. Both counts in which Tapen was named arose out of a common scheme in which all of the defendants participated. Joinder was therefore proper. See, e.g., Schaffer v. United States, 362 U.S. 511, 514-16, 80 S.Ct. 945, 947-48, 4 L.Ed.2d 921 (1960). Nor do we think it relevant that Tapen became involved in the conspiracy later than his co-defendants; this does not absolve him of "liability for the conspiracy's unlawful acts committed both before and after his adoption of the conspiracy." United States v. Guillette, 547 F.2d 743, 751 (2d Cir.), cert. denied, 434 U.S. 839, 98 S.Ct. 132, 54 L.Ed.2d 102 (1977). Nor does his subsequent withdrawal from the conspiracy constitute a sufficient ground for severance, see United States v. Ventura, 724 F.2d 305, 312 (2d Cir.1983). The court instructed the jury that evidence relating to the conspiracy after Tapen left LSC could not be considered against him.[8] Judge Broderick acted well within his discretion, see Opper v. United States, 348 U.S. 84, 95, 75 S.Ct. 158, 165, 99 L.Ed. 101 (1954), in denying Tapen's Rule 14 motion.
 
 
 26
 Convictions affirmed.
 
 
 
 [1]
 Drexler was disbarred in Minnesota, the only state in which he was admitted to practice, in 1971. He was indicted by a federal grand jury in the Southern District of California on May 5, 1981, for tax-related offenses arising out of his activities in LSC. He was convicted by a jury in November, 1981, and in January, 1982 was sentenced to a prison term
 
 
 [2]
 Reichert, acting on the advice of his attorney and accountant, decided not to accept Drexler's proposal. Ranucci nevertheless decided to go ahead on his own, telling Reichert that the "church has more viability than the vending business," and that this might be his last chance to become a millionaire
 
 
 [3]
 Tapen left LSC in late 1980 to form a new "church," the Church of the Holy Scriptures ("CHS"). He tried to convince several LSC "elders" to leave LSC and join him in CHS, telling them that CHS would advocate the 50% method because it was safer for the average "minister," and that CHS would charge only $2,000 to join, which would make it easier to sign up new recruits. He also stated that leaving LSC was advisable because the legal fees that LSC would have to pay to resist government attack would bankrupt the organization
 
 
 [4]
 On March 21, 1985, defendant Donna Petrozza was severed from the case on grounds unrelated to the merits
 
 
 [5]
 Evidence of Ebner's prior convictions was received to impeach his testimony at trial, pursuant to Fed.R.Evid. 609
 
 
 [6]
 Judge Broderick excluded those parts of the opinion that recited facts, so that the jury could not have been prejudiced with respect to consideration of the government's evidence. This left only Justice Schwartz's findings as to the applicable law
 
 
 [7]
 Although the last year for which any of the defendants was charged with tax evasion was 1981 and Justice Schwartz did not render his opinion until April 27, 1982, the opinion and the notice it provided to defendants was nevertheless relevant. The decision was filed only 12 days after the deadline for 1981 tax returns, yet no defendant against whom the evidence was received in evidence has ever filed a 1981 return. Schneider filed no return for 1982, and Ranucci, Ebner, Petrozza, and Rodi filed no returns for 1982 or 1983. Ebner, Petrozza, and Rodi did not file tax returns for 1984. The jury may consider evidence of intent to evade taxes in one year as evidence of intent to evade payment in prior or subsequent years. See, e.g., United States v. Farber, 630 F.2d 569, 572 (8th Cir.1980). Further, the indictment alleged that the conspiracy continued through the filing of the superseding indictment in 1985, and there was proof that the defendants against whom the opinion was offered continued to claim to live under "vows of poverty" and to maintain property and bank accounts in the names of their "churches" even after Justice Schwartz issued his opinion
 
 
 [8]
 Nor does Tapen's acquittal on the conspiracy count mean that his trial on the substantive count should have been severed. Even when joinder of defendants is predicated on a conspiracy count on which the evidence is so insufficient that it is dismissed without submission to the jury, a severance of defendants as to remaining substantive counts need not be granted absent a showing of prejudice from the joinder or of bad faith on the Government's part in bringing the conspiracy charge. United States v. Variano, 550 F.2d 1330, 1334 (2d Cir.), cert. denied, 434 U.S. 892, 98 S.Ct. 268, 54 L.Ed.2d 178 (1977)