OPINION OF THE COURT
John A. Milano, J.
When does an individual’s First Amendment right to free *702 dom of religion yield to the State’s duty to protect its citizens? This issue has been presented to the court via the prosecution of a member of the Sikh religion for possession of an exposed knife, a violation of section 10-133 of the Administrative Code of the City of New York.
The Sikh religion was founded in the Punjab, an area of Northwest India, by Guru Nanak (1469-1539). The Guru sought to combine Hindu and Muslim elements in a single religious creed. The Hindu concepts of Karma and rebirth were accepted, but the Indian caste system was rejected. Sikhs believe that God is the only reality and that spiritual release can be obtained by taming the ego through devotional singing, recitation of the devine name, meditation and service.
Guru Nanak was followed by 10 masters, the last of whom was Guru Gobind Singh (1666-1708). In 1799, under Ranjit Singh, they laid claim to a large part of Northwest India. Subsequently, the British annexed the Punjab province despite violent opposition. (1845-1846.) But, with Indian independence (1947), the Sikhs were given control of their guduwaras (holy places), the most sacred being the Golden Temple at Amritsar, in Punjab.
Sikhs are readily identifiable by their turbans. They take a vow not to cut their hair as well as not to smoke or drink. When the tenth guru, Gobind Singh, founded the martial fraternity of Khalsa, a golden race of warrior saints, his followers vowed to keep five symbols of their religion known as the five k’s. They are as follows: to wear long hair (Kesh); to keep a comb in their hair (kangha); a steel bracelet on the right wrist (kalha); an undergarment (kasha); and a sword (kirpan).*
The kirpan or sword is the crux of this prosecution, for on January 16, 1986, Transit Police Officer Anthony Grimaldi observed the defendant in possession of a knife on the southbound platform of the Main Street subway station in Flushing, Queens County. A summons was issued to the defendant, Partap Singh, for violating section 10-133 (c) of the Administrative Code, which makes it unlawful for any person in a public place, street or park, to wear outside of his or her clothing or carry in open view any knife with an exposed or unexposed blade unless such person is actually using such knife for a lawful purpose as set forth in subdivision (d) of said section 10-133. A violation of this section is an offense punish *703 able by a fine of not more than $300 or by imprisonment not exceeding 15 days or by both such fine and imprisonment.
The defendant maintains that this knife is a symbol of his religion and as such it was not intent to possess it in violation of any law but rather to adhere to the tenets of his religion. This court must weigh the defendant’s constitutional First Amendment right to practice his religion as he so chooses, with the police power of New York State to regulate the possession of lethal weapons and dangerous instruments.
The legislative findings which preface Administrative Code § 10-133 set forth the intent of the City Council upon passage of this legislation. Section 10-133 (a) states in pertinent part: "It is hereby declared and found that the possession in public places, streets and parks of the city, of large knives is a menace to the public health, peace, safety and welfare of the people of the city; that the possession in public places, streets and parks of such knives has resulted in the commission of many homicides, robberies, maimings and assaults of and upon the people of the city * * * It is further declared and found that the wearing or carrying of knives in open view in public places while such knives are not being used for a lawful purpose is unnecessary and threatening to the public and should be prohibited” (emphasis added). The statute delineates the categories of persons who are exempt from the statute (subd [d]) by reason of carrying a knife for a lawful purpose, i.e., persons in the military service of the State of New York, police officers and peace officers, participants in special events when authorized by the Police Commissioner, etc. Clearly, the defendant herein is not excused from prosecution pursuant to a legislative exemption. The question then arises, what of the defendant’s First Amendment right to freedom of religion?
The US Constitution’s most important guarantees with respect to religion are set forth in the First Amendment’s opening words: "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof’. This Establishment Clause applies to States as well as Federal action through the incorporation of their principles into the Fourteenth Amendment Due Process Clause. (Abington School Dist. v Schempp, 374 US 203, 253-258 [Brennan, J., concurring] [1963].) The Free Exercise Clause was first applied to the States in 1940 in Cantwell v Connecticut (310 US 296 [1940]). However, even before the enactment of the Fourteenth Amendment in 1868, New York had recognized the First *704 Amendment right to religious freedom by passing a general common school law in 1844 which provided that no religious instruction should be given that could be construed to violate the right of conscience "as secured by the constitution of this state and the United States” (L 1844, ch 320, § 12).
The conflict between the US Constitution’s Free Exercise Clause and State action has a lengthy history. Several decisions in the 1930’s and early 1940’s laid a doctrinal foundation that government pursue the least drastic means to a compelling secular end. (Schneider v State, 308 US 147 [1939]; Cantwell v Connecticut, supra.) Thus, a requirement for police permits prior to soliciting for religious contributions was struck down by the Supreme Court as an unnecessary infringement on religious expression. (See also, Murdock v Pennsylvania, 319 US 105 [1943].) A basic principle was established that the government’s secular purpose must be linked in a unique way to the burden the government imposes on religion and no matter how compelling the purpose the least restrictive path must be pursued.
There are numerous situations, however, where least restrictive paths do not exist. Thus, the State may protect children from burdensome and exploitive child labor despite their parent’s belief that the young should be used to proselytize the pagans. (Prince v Massachusetts, 321 US 158 [1944].) Similarly, a parent could not withhold a lifesaving blood transfusion from the child on religious grounds. (Jehovah’s Witnesses v King County Hosp. Unit No. 1, 390 US 598 [1968].) Nor does a State statute which prohibits polygamy yield to a Morman’s religious objection. (Reynolds v United States, 98 US 145 [1878].) The Supreme Court has also held that a conscientious objector exemption from conscription may be denied to those who protest "unjust wars” on religious grounds while stating no objection to other conflicts. The denial is justified by "the Government’s interest in procuring the manpower necessary for military purposes, pursuant to the * * * grant of power to Congress to raise and support armies” (Gillette v United States, 401 US 437 462 [1971]). As recently as March 30, 1987, the Supreme Court upheld the suspension of an Oregon teacher £ garb in the classroom. (Cooper v Eugene School Dist., — US — 94 L Ed 2d 784.) The Oregon court ruled that the burden the law placed on the teacher’s free exercise of religion was outweighed by the important State interest in insuring the religious neutrality of the school. The Supreme Court dis-suspension of an Oregon teacher *705 missed the teacher’s appeal "for want of a substantial federal question” (— US, supra, at —, 94 L Ed 2d, supra, at 784).
This court must therefore use a delicate balancing test to determine the propriety of this prosecution. Administrative Code § 10-133 promotes a legitimate governmental objective and has withstood constitutional attacks of being void for vagueness. (People v Ortiz, 125 Misc 2d 318 [1984].) And in regard to the sincerity of the defendant’s beliefs, in United States v Ballard (322 US 78, 86-87 [1944]), Justice Douglas expressed the breadth and depth of the Free Exercise Clause in our society: "Freedom of thought, which includes freedom of religious belief, is basic in a society of free men * * * It embraces the right to maintain theories of life and of death and of the hereafter which are rank heresy to followers of the orthodox faiths * * * Men may believe what they cannot prove. They may not be put to the proof of their religious doctrines or beliefs * * * The religious views espoused by respondents might seem incredible, if not preposterous, to most people. But if those doctrines are subject to trial before a jury charged with finding their truth or falsity, then the same can be done with the religious beliefs of any sect.”
Several courts in New York State have yielded State interest in favor of accommodating religious beliefs. In Smith v Community Bd. No. 14 (128 Misc 2d 944 [1985]) an orthodox Jewish sect was granted permission by the local community board to construct and maintain an eruv, which under Jewish law was an unbroken physical delineation of the area. The eruv was created by increasing the height of various sea walls and stringing wires from existing telephone poles. The court found the establishment of the eruv does not violate either the United States or New York constitutional prohibition of religious entanglement with government affairs. (Supra, at 948; see also, Matter of Holy Spirit Assn. for Unification of World Christianity v Rosenfeld, 91 AD2d 190 [1983].)
However, this court, in this particular case, on balance, is constrained to find in favor of the People in its prosecution. At best, the intrusion on the defendant’s First Amendment rights is de minimis and must yield by necessity to the State’s primary duty to protect its citizens and to reduce the risk of crimes of violence and other conditions detrimental to the public peace and welfare. While freedom to believe and worship as one chooses must remain absolute and unfettered, the State may restrict acts and conduct if the intrusion is justified by a compelling State interest to protect the health and safety *706 of its citizens. (People v Life Science Church, 113 Misc 2d 952 [1982], appeal dismissed 93 AD2d 774 [1983], appeal dismissed 60 NY2d 643 [1983], Iv denied 61 NY2d 604 [1984], cert denied 469 US 822 [1984]; La Rocca v Lane, 37 NY2d 575 [1975], cert denied 424 US 968 [1976]; People v Woodruff, 26 AD2d 236 [1966], affd 21 NY2d 848 [1968].)
This court does not question the good faith and religious intentions of Sikhs in general or of the defendant Partap Singh, who is a Sikh by religion and a priest by profession, requiring from them in accordance with their tenets, the strict observance of the five "K’s”. But the rational connection between the prohibited act and the public safety justifies the lack of a scienter requirement in the enforcement of Administrative Code § 10-133. (People v Ortiz, supra.) Furthermore, granting an exemption in this particular case would place an intolerable burden on law enforcement officials where someone dressed in the religious and ceremonial garb of a Sikh, carrying a "Kirpan” in full view in a public place, required an official intrusion and searching inquiry on the part of the said official as to whether in fact said person was actually a "Sikh” in custom, practice and religion.
The issue of First Amendment rights and freedom of religion guaranteed by the Bill of Rights is even more significant this year as we approach our bicentennial constitutional celebration. In Queens County, the 1980 Census reported an Asian-Indian population of 21,736, of which a small portion are Sikhs. Queens Borough President Claire Shulman in her remarks on April 28, 1987, at Queens College, concerning a City Charter Revision Commission hearing, stated, inter alia: "Queens is one of the largest and most diverse counties in the nation. With a population of approximately 2 million people, we are larger than 17 states and 49 countries. In fact, if we were a separate municipality, we would be the sixth largest city in the country. Our people have come here from around the world and speak more than 150 different languages and dialects. Yet despite our racial, religious and ethnic differences, we share many of the same hopes, dreams and aspirations * * * We cherish common ideals of liberty and justice.”
It therefore becomes incumbent upon this court to effectuate a fair and rational balance between religious freedoms and the enforcement of criminal statutes designed to protect, among others, the very citizens and residents who now assert their religious right to observe certain customs and traditions inherent in their faith. Perhaps a solution to the problem can *707 be advanced by this court: A "symbolic kirpan” encased in a solid protective element such as plastic or lucite would remove it from the category of knife or weapon, thereby relieving the wearer from the liabilities inherent in Administrative Code § 10-133 while at the same time permitting the observance of the five "K’s”. Further, it is clear that the wearing of the "Kirpan” in a Sikh temple would not violate the said section.
CONCLUSION
While this court finds that the People may maintain this action because there is no basis for dismissal as a matter of law, nevertheless, it is the considered judgment of this court that the continuance of this prosecution would not be in the furtherance of justice and that dismissal is required as a matter of judicial discretion for the reasons heretofore stated by this court. There exists compelling factors and circumstances that clearly demonstrate that conviction or prosecution of the said defendant upon the said accusatory instrument could constitute or result in injustice and would serve no useful purpose.
Accordingly, this court, sua sponte, upon consideration of the various factors delineated in CPL 170.40 dismisses this prosecution in the interest of justice.

 Singh, The Religion of Singh (1971).