UNITED STATES of America,

v.

Charles H. RINGWALT.

No. CR.A. 01–192.

United States District Court,
E.D. Pennsylvania.

July 31, 2002.

John J. Pease, Thomas R. Perricone, U.S. Attorney's Office, Philadelphia, PA, for U.S.

Jeffrey M. Kolansky, Kolansky and Strauss, P.C., John Rogers Carroll, Carroll & Carroll, Philadelphia, PA, for Charles H. Ringwalt.

MEMORANDUM

EDUARDO C. ROBRENO, District Judge.

On April 10, 2001, a federal grand jury returned an indictment against defendant Charles H. Ringwalt, III, charging him with two counts of income tax evasion under 26 U.S.C. § 7201,[1] three counts of

---

1. The elements of a § 7201 offense are willfulness, the existence of a tax deficiency, and an affirmative act constituting an evasion or attempted evasion of the tax. *See Sansone v. United States*, 380 U.S. 343, 351, 85 S.Ct. 1004, 13 L.Ed.2d 882 (1965).

willfully subscribing to false tax returns under 26 U.S.C. § 7206(1),[2] and one count of aiding and assisting the preparation of false tax returns under 26 U.S.C. § 7206(2). The charges involved the filing of false and fraudulent personal and corporate income tax returns relating to the defendant's taxable income in 1994 and 1995 from Stelwagon Manufacturing Corporation ("Stelwagon"), a Subchapter S corporation in which defendant Ringwalt was the president and sole shareholder. The government charged that in 1994 and 1995 defendant willfully evaded taxes by fraudulently deducting approximately $1.6 million dollars of personal expenditures as business expenses. At trial, the government produced evidence showing that the defendant used this money to support a lavish lifestyle that included gambling, country club memberships, private school tuition, landscaping, limousines, parties, home furnishings, and jewelry. The defendant admitted that the returns at issue were not accurate but claimed that this was the fault of the company's controller and of accountants defendant had retained to prepare his tax returns. The issue was whether the defendant acted with the requisite intent in filing inaccurate tax returns for the two years included in the indictment. On January 17, 2002, defendant was convicted by a jury on all counts.

Presently before the court are defendant's Motion for a Judgment of Acquittal (doc. no. 64), Motion for a New Trial under Federal Rule of Criminal Procedure 29 (doc. no. 65), and Supplemental Post–Trial Motion for a New Trial (doc. no. 112).[3] Defendant argues that he is entitled to a judgment of acquittal because the evidence produced by the government at trial was

---

2. Section 7206(1) states that it is a felony for an individual to "[w]illfully make[ ] and subscribe[ ] any return, statement or other document, which contains or is verified by a written declaration that is made under the penalties of perjury, and which he does not believe to be true and correct as to every material matter. . . ." 26 U.S.C. § 7206(1).

3. A procedural background of the post-trial briefing in this case is instructive. After defendant's conviction on January 17, 2002, the court issued a scheduling order for the filing of post-trial motions. Defense counsel, John Rogers Carroll, Esquire, of Carroll & Carroll, filed timely motions for judgment of acquittal (doc. no. 64) and for a new trial (doc. no. 65) on January 31, 2002. Thereafter, Mr. Carroll filed a timely brief in support of these motions on April 19, 2002. In mid-April, 2002, defendant retained new counsel, Jeffrey M. Kolansky, Esquire, of Kolansky, Tuttle, & Rocco, P.C., and on April 29, 2002, Mr. Carroll was granted permission to withdraw from the case.

A hearing on defendant's original post-trial motions was held on June 20, 2002. On June 19, 2002, defendant filed a supplemental post-trial motion (doc. no. 97) asserting that trial counsel failed to call key witnesses to testify at trial. The court thereafter continued the hearing to July 19, 2002, to allow for further briefing on any additional post-trial issues. At the June 20, 2002 hearing, Mr. Kolansky informed the court that he did not have access to defendant's file in possession of Carroll & Carroll. After a series of hearings and conferences between new counsel, former counsel, the government and the court, on June 28, 2002, the court ordered that Mr. Kolansky be given access to a portion of the file. Mr. Kolansky was given access to the file on that date.

On July 3, 2002, defendant filed a new supplemental post-trial motion (doc. no. 112) seeking (1) to withdraw the earlier supplemental post-trial motion (doc. no. 97) and (2) a new trial based on the government's failure to disclose *Brady* material. The government filed a response on July 12, 2002. On July 19, 2002, the court heard oral argument regarding the defendant's *Brady* motion. At the close of the hearing, the defendant provided the court and the government with a written reply to the government's July 12, 2002 response to defendant's *Brady* motion asserting an additional argument of prosecutorial misconduct in support of his post-trial relief. The government filed a response on July 22, 2002. Thus, all of the issues raised in the extensive post-trial briefing in this case are ripe for decision.

insufficient to prove that he possessed the requisite intent when he committed the acts charged in the indictment. Defendant also maintains that he is entitled to a new trial for the following reasons. First, the court erred in admitting the following evidence: (1) defendant's 1992 and 1993 tax returns, not charged in the indictment, (2) defendant's extra-marital sexual relationship with a Stelwagon employee and government witness Melanie Costa, and (3) government exhibit 489, purporting to be a calendar prepared after defendant filed his 1994 tax return in order to document his business expenses for the 1994 tax year. Second, the court erred in precluding defense expert, Samuel Fisher, CPA, from testifying about the failure of John Curran, the Stelwagon controller, to meet the professional responsibilities of his job. Third, the government failed to disclose evidence favorable to the defendant and material to his defense in violation of his Fifth Amendment rights to due process as set forth in *Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963). Lastly, the defendant maintains that the government's failure to turn over this *Brady* material, while arguing facts not in evidence which were contrary to the non-disclosed evidence, constituted prosecutorial misconduct which deprived defendant of due process under the Fifth Amendment.

The court finds that the evidence produced by the government at trial was sufficient to support the jury's verdict on all counts. The court further finds that the admission of the evidence to which defendant objects and the limitation on the testimony of Mr. Fisher was proper under the Federal Rules of Evidence. Moreover, the court holds that defendant has not demonstrated a *Brady* violation and to the extent that prosecutorial misconduct occurred in this case, it does not warrant a new trial. Thus, defendant's motions will be denied.

A. *Motion for Judgment of Acquittal Pursuant to Rule 29(c).*

■ Defendant's argument in support of his motion for judgment of acquittal is identical to his defense asserted at trial, *i.e.*, that the evidence produced by the government was insufficient to prove that defendant knew at the time the 1994 and 1995 tax returns were filed that they were false and that he willfully filed a false tax return or willfully evaded taxes due.

"[W]hen deciding whether a jury verdict rests on legally sufficient evidence [pursuant to Federal Rule of Criminal Procedure 29] ... [a court] must view the evidence in the light most favorable to the government, and ... sustain the verdict if any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *United States v. Dent*, 149 F.3d 180, 187 (3d Cir.1998).

■ The Supreme Court defined "willfulness" in the criminal tax context as a "voluntary, intentional violation of a known legal duty." *Cheek v. United States*, 498 U.S. 192, 201, 111 S.Ct. 604, 112 L.Ed.2d 617 (1991). The government's burden of proving knowledge of a legal duty "requires negating a defendant's claim of ignorance of the law or a claim that because of a misunderstanding of the law, he had a good faith belief that he was not violating any of the provisions of the tax laws." *Id.* at 202, 111 S.Ct. 604. As the Third Circuit has stated:

> Willfulness is closely connected to the affirmative act element of § 7201. Evidence of affirmative acts may be used to show willfulness, and the defendant must commit the affirmative acts willfully to be convicted of tax evasion. Under § 7201, if the affirmative act element is satisfied, there is no question that willfulness is also present.

*United States v. McGill*, 964 F.2d 222, 237–38 (3d Cir.1992) (citations and quotations omitted).

■ The government may prove willfulness through direct or circumstantial evidence. As the Third Circuit has explained:

In the majority of criminal cases, the element of intent is inferred from circumstantial evidence. The rule is no different in tax evasion prosecutions. The Supreme Court [has] stated that "any conduct, the *likely* effect of which *would be* to mislead or conceal," is sufficient to satisfy the "affirmative act" element. These cases simply require that there be some evidence from which a jury could infer an intent to mislead or conceal beyond mere failure to pay assessed taxes; it is for the jury to determine, as a matter of fact, whether the affirmative act was undertaken, in part, to conceal funds from or mislead the government.

*United States v. Voigt*, 89 F.3d 1050, 1090 (3d Cir.1996) (citations omitted) (emphasis in original). The government may show willfulness by pointing to evidence that the defendant kept a double set of books, made false entries or alterations in his books of accounting, created false invoices or documents, concealed assets or covered up sources of income, or did "any conduct, the likely effect of which would be to mislead or to conceal." *Spies v. United States*, 317 U.S. 492, 499, 63 S.Ct. 364, 87 L.Ed. 418 (1943).

Defendant argues that while the uncontested evidence clearly showed that over $1 million of defendant's personal expenses and cash advances were recorded in the books for Stelwagon as business expenses for the 1994 and 1995 tax years, the government failed to offer sufficient evidence that at the time defendant signed the re-

turns, he was aware that these personal expenditures had been lumped together with the business expenses. Defendant contended, through the testimony of former employee, Jack Keenan, and cross-examination of government witnesses and arguments of counsel,[4] that he was an absentee owner of Stelwagon who relied on his controller, John Curran, to separate personal and business expenses and to manage the bookkeeping; Curran knew that the business account contained mixed personal and business expenses and it was Curran's job to sort between the two, if necessary, and that Curran failed to do so. Moreover, according to defendant, he never submitted expense reports or made up anything in an attempt to make it appear that his personal expenses were business expenses. Rather, he left this job up to Curran. Defendant also maintained that he relied on his accountant Ray Mock, of the accounting firm Maillie Falconiero, to prepare and file accurate tax returns. Finally, the defendant asserted that the government produced no evidence that, prior to signing and filing his 1994 and 1995 tax returns, defendant discussed the content of those returns with his attorneys.

In support of this defense, defendant cites *United States v. Pechenik*, 236 F.2d 844 (3d Cir.1956). In *Pechenik*, the government alleged that the defendant improperly treated capital expenditures as operating expenses, thereby deducting in a single year expenditures which should have been deducted over a period of years through depreciation. *Id.* at 845. The Third Circuit reversed Pechenik's tax evasion conviction because the:

defendant, notwithstanding the business experience attributed to him, left the books, bookkeeping and preparation of tax returns to the bookkeeper and accountant.... There is no evidence that

---

4. As he was constitutionally entitled to do, defendant did not testify at trial.

the defendant interfered with either of them or with the books. On the contrary, the invoices and payments were taken care of by the bookkeeper in the ordinary course of business and he made the decisions as to classifications of expenditures according to his own best judgment. *Id.* at 846. Furthermore, in *Pechenik*, the accountant was hired to perform quarterly audits of the corporation's books, although this did not include an examination of the corporation's invoices. *Id.*

The court finds that defendant's reliance on *Pechenik* is misplaced. Unlike *Pechenik*, the instant case presents substantial evidence of defendant's direct involvement in the scheme to report personal expenses as business expenses. First, the defendant's direct involvement was shown by evidence that the defendant signed and authorized a number of large corporate checks for personal expenses for which he did not provide John Curran with back up or expense reports. Secondly, unlike the bookkeeper in *Pechenik*, John Curran testified that defendant directed him to classify certain personal expenses as business expenses and rebuffed Curran's attempts to discuss the mixing of personal and business expenses. Third, defendant's purported "absence" defense differs from *Pechenik* because, according to the testimony of Curran and defendant's accountant, Ray Mock, during the course of two audits and a burgeoning criminal investigation of defendant's tax affairs, defendant never stated to investigating authorities that he believed that Curran or Mock had committed professional errors, or that the expenditures at issue were anything other than

business expenses. Fourth, the accountants in *Pechenik* conducted quarterly audits of defendant's books while defendant Ringwalt never engaged his outside accountant to do so here. Finally, *Pechenik* involved a the relatively complex tax issue of whether a certain deduction could be expensed all in one year or must be depreciated over a period of years. By contrast, this case involves the prohibition, nearly axiomatic particularly in the case of an experienced businessperson, against deducting personal expenses as business expenses for the purpose of decreasing tax liability.[5]

Additionally, based on the following evidence introduced by the government at trial, the court finds that there was sufficient evidence for a reasonable jury to find beyond a reasonable doubt that defendant willfully evaded taxes and filed false tax returns. First, based on the defendant's consistent pattern of under-reporting large amounts of taxable income—more than $1 million over 2 consecutive years, from 1994 to 1995, totaling more than 50% of defendant's overall income—a reasonable jury could have determined that defendant's conduct was not the result of mistake. Where there is "evidence of a consistent pattern of under-reporting large amounts of income, and of the failure on the [defendants'] part to include all of their income in their books and records," the Supreme Court held that "the jury could [find] that these acts supported an inference of willfulness," supporting a guilty verdict. *Holland v. United States*, 348 U.S. 121, 139, 75 S.Ct. 127, 99 L.Ed. 150 (1954) (citing *Spies*, 317 U.S. at 499–500, 63 S.Ct. 364).

---

**5.** Furthermore, subsequent opinions in other circuits have distinguished *Pechenik* on facts similar to those present here. *See, e.g., United States v. Garavaglia*, 566 F.2d 1056, 1059–60 (6th Cir.1977) (distinguishing *Pechenik* because alleged tax evasion was defendant's personal failure to record receipts which

constituted business income); *Windisch v. United States*, 295 F.2d 531, 532 (5th Cir. 1961) (unlike *Pechenik*, defendant did not engage accountant to make an audit, and the accountant relied upon defendant to supply the necessary information as to income and expenditures).

Second, defendant's pursuit of the identical tax evasion scheme during 1992 and 1993 is additional evidence of willfulness for the charged years of 1994 and 1995. "[A] defendant's past taxpaying record is admissible to prove willfulness circumstantially." *United States v. Bok,* 156 F.3d 157, 165 (2d Cir.1998) (holding that defendant's failure to file returns for years before and after those in the indictment admissible to show intent to evade tax system). *See also United States v. Johnson,* 893 F.2d 451, 453 (1st Cir.1990) ("The evidence that [defendant] submitted W–4 form in 1987 claiming more allowances than he was entitled to and did not file an income tax return for 1987, was relevant to show [defendant's] willfulness and absence of mistake in filing the Schedule C forms containing false information during the years 1982–86."); *United States v. Ebner,* 782 F.2d 1120, 1126 n. 7 (2d Cir.1986) ("The jury may consider evidence of intent to evade taxes in one year as evidence of intent to evade payment in prior or subsequent years."); *United States v. Adcock,* 558 F.2d 397, 402 (8th Cir.1977) ("It is ... well settled that in a tax case the government may show proof of unreported income in prior years indicating a pattern of understatement of income which is relevant to the issue of willful intent.").

Third, the court finds that it was reasonable for the jury to infer, from the circumstances surrounding defendant's receipt of manual checks from the business accounts, that the checks were a substitute for payroll. Melanie Costa, defendant's secretary and paramour during the relevant period, and John Curran, Stelwagon's controller,

testified that defendant obtained, signed and cashed manual checks three or four times a month, and the amounts of the checks were consistent and in large round dollar amounts. This evidence is particularly revealing in light of the fact that the defendant's receipt of his "7550 account" [6] checks began to climb significantly in 1991, the same year in which he removed himself from the company payroll and converted Stelwagon from a Subchapter C to a Subchapter S corporation.[7]

Fourth, according to the testimony of defendant's accountant Ray Mock and as reflected in engagement letters Mock sent to defendant, defendant was informed of the difference between an audit and a compilation. It was explained to the defendant that the latter would be created entirely on the basis of information that defendant provided to his accountants and that the individual with the ultimate responsibility for the accuracy of the corporate tax returns is the officer (i.e. defendant) who will sign them and would not require verification of the company's books and records by the accountants. In the past, Stelwagon had its books audited, but in the early 1990's defendant changed the method of accounting and hired the accountants to perform compilations, not audits. Based on this evidence, a reasonable jury could infer that defendant chose a compilation over the audit method because he had something to hide.

Fifth, John Curran's testimony was probative of defendant's willfulness. Curran testified that defendant told him that his corporate American Express account reflected business expenses. Curran also

---

**6.** The "7550 account" is Stelwagon account number 1007550, which was set up to record the business-related selling expenses of defendant.

**7.** A Subchapter S corporation profit or loss is passed through to shareholders and reported

on the shareholders' tax returns. A Subchapter S corporation generally does not pay tax at the corporate level. Defendant was the 100% shareholder of Stelwagon Manufacturing Corporation.

stated that defendant rebuffed him on several occasions throughout the years when he suggested to defendant that if he was running personal expenditures through his 7550 expense account and the American Express account, those expenditures should be identified and separated from the ordinary business expenses. Finally, Curran testified that in 1995 defendant dismissed Curran's concerns regarding the large dollar amounts being booked through the 7550 account by informing Curran that if defendant ever got caught, he would pay it.[8] This evidence could have been construed by the jury as a direct admission by the defendant of his criminal willfulness.

Sixth, during the City of Philadelphia's audit of Stelwagon for the 1994 tax year, defendant's accountants asked him to provide documentation for his claim that the disputed expenses were business-related. In response, defendant sent his accountant a calendar for 1994 which purported to justify these business-related expenses allegedly incurred entertaining clients, including dates and amounts. However, many of Stelwagon's biggest roofing customers during the 1990s testified at trial that the defendant never entertained them, or at most took them out on one or two occasions during the entire business relationship spanning many years.[9] This testimony was absolutely contrary to the defendant's claim that he had used the large amounts of money for legitimate business related expenses. Thus, the jury could have reasonably concluded that the calendar was a conscious effort on defendant's part to cover up his willful tax evasion.

Lastly, on February 26, 1996, Maillie Falconiero, the defendant's outside accountants, sent defendant a letter describing the result of the City's audit: a disallowance of $814,073 in asserted business expenses appearing to be personal in nature. Despite this advice, defendant signed and filed his 1995 tax return which listed the very same type of expenses as business expenses that the City had disallowed as business expenses. That defendant was aware of the disallowance of these expenses by the City auditors and nevertheless took no steps to insure that the alleged "mistakes" were not repeated in his 1995 federal tax returns is evidence of willfulness.

Thus, based on the foregoing evidence produced by the government at trial, the court finds that viewed in the light most favorable to the government, the winner of the jury verdict, the evidence was more than sufficient to support the jury's verdict. Accordingly, defendant's motion for a judgment of acquittal will be denied.

### B. *Defendant's Motion for a New Trial.*

Defendant has moved for a new trial on the basis that the court erred in admitting (1) defendant's 1992 and 1993 tax returns, not charged in the indictment, (2) defendant's extra-marital sexual relationship with a Stelwagon employee and government witness Melanie Costa, and (3) government exhibit 489, a calendar prepared after defendant filed his 1994 tax return documenting his alleged business expenses for 1994, into evidence at trial, and that

---

8. Defendant argues that this statement does not prove defendant's intent because Curran was not able to date the alleged conversation or confirm whether it occurred before the filing of the 1994 or 1995 returns. Further, the statement does not specify whether it was made in the context of the City of Philadelphia audit or another event. However, these infirmities go to the weight of the evidence

presented by Curran; it was for the jury to decide whether or not his testimony was believable.

9. This was confirmed by other witnesses including defendant's son, a vice-president at Stelwagon, and Jack Keenan, Stelwagon's general manager.

the court erred in precluding defense expert, Samuel Fisher, CPA, from testifying about the failure of John Curran, the Stelwagon controller, to meet the professional responsibilities of his job.

Federal Rule of Criminal Procedure 33 allows a court, upon motion of a defendant, to "grant a new trial to that defendant if required in the interest of justice." Fed. R.Crim.P. 33. Where a claim is made that evidence was improperly admitted or excluded, a new trial should be granted if the error was "of sufficient magnitude to require reversal on appeal." 3 Charles A. Wright, et al., *Federal Practice and Procedure: Criminal,* § 556, at 306, 309 (2d ed.1982). The decision to grant a new trial pursuant to Rule 33 lies within the sound discretion of the trial court. *See United States v. Adams,* 759 F.2d 1099, 1108 (3d Cir.1985). The court will address each of the defendant's arguments seriatum.

1. *The admission of evidence concerning defendant's 1992 and 1993 tax returns.*

■ The government moved *in limine* to admit defendant's 1992 and 1993 personal and corporate tax returns as evidence of defendant's willfulness and to show the existence of a similar scheme and plan to evade income taxes. After hearing argument on this issue, the court ruled that the 1992 and 1993 returns were admissible under Federal Rule of Evidence 404(b) and that the probative value of the evidence substantially outweighed its prejudicial effect under Federal Rule of Evidence 403.

Rule 404(b) is a rule of inclusion, not exclusion and the burden on the government when proffering 404(b) bad act evidence "is not onerous." *United States v. Sampson,* 980 F.2d 883, 888 (3d Cir.1992). Yet, the government "must clearly articulate how the evidence fits into a chain of logical inferences no link of which can be

the inference that because the defendant committed ... offenses before, he therefore is more likely to have committed this one." *Id.* at 886. Once the government has done so, the district court must weigh the probative value of the evidence against its potential to cause undue prejudice, pursuant to Rule 403, and articulate a rational explanation on the record for its decision to admit or exclude the evidence. *United States v. Himelwright,* 42 F.3d 777, 780 (3d Cir.1994).

Defendant argues that the earlier tax returns are a repetition of the charged acts and are not evidence of willfulness, knowledge, plan or scheme or absence of mistake because defendant conceded that the 1994 and 1995 tax returns were inaccurate, albeit mistakenly so. According to defendant, evidence that the same mistake was made in the earlier years, *i.e.,* business and personal expenses were commingled in the earlier years in the same way as the years for which the defendant is charged, is not probative of whether the defendant knew all along that the business expenses deducted for the tax years charged in the indictment were false.

■ The court disagrees. It is clear that "a defendant's past taxpaying record is admissible to prove willfulness circumstantially." *Bok,* 156 F.3d at 165 (holding that defendant's failure to file returns for years before and after those in the indictment admissible to show intent to evade tax system). *See also Johnson,* 893 F.2d at 453; *Ebner,* 782 F.2d at 1126 n. 7; *Adcock,* 558 F.2d at 402. In *Adcock,* the court noted that the government may offer evidence of past taxpaying record during its case-in-chief without waiting for the defendant to deny the existence of intent because intent is an essential element of the offense which must be proved beyond a reasonable doubt. *Id.* at 402.

In this case, the government's "chain of logical inferences" consisted of evidence

that defendant's 1992 and 1993 corporate and personal income tax returns showed the existence in those prior years of the identical scheme and plan to evade income taxes that was used by defendant in 1994 and 1995, and willfulness, intent and absence of mistake by defendant for the charged years. The government proffered evidence that, in the early 1990s, the defendant removed himself from the company payroll, took large amounts of money from the company 7550 account and American Express account, and deducted the same expenses as business expenses in his 1992 and 1993 tax returns. This was the very same scheme the defendant used to generate improper deductions in the 1994 and 1995 tax returns. Thus, in light of the defendant's theory that the inaccuracies in the 1994 and 1995 returns were the result of mistake or the fault of the accountants, the tax returns from the earlier years were probative on the issues of common scheme or plan as well as willfulness.

Next, the court found that the evidence's probative value was not substantially outweighed by the danger of unfair prejudice under Federal Rule of Evidence 403.[10]

Finally, the court gave an appropriate limiting instruction to the jury during the charge explaining the very limited purpose for which the evidence concerning the prior years' returns was offered, and cautioned the jury that they may consider the evidence only for this limited purpose.[11]

Thus, the court finds that evidence concerning defendant's 1992 and 1993 income tax returns was properly admitted for the limited purposes of proving willfulness, in-

---

10. The court set forth its reasoning for this finding on the record:

> The probative value of the evidence of the 1992 and 1993 tax returns is significant and directly deals with a key element of the government's case, namely the defendant's state of mind. Likewise, while prejudicial, the evidence does not present a substantial danger of unfair prejudice because it is limited in time and has a nexus to the immediate years which are the subject of this case. Therefore, the court finds that the evidence is permissible under Rule 403.

Order, January 7, 2002, at 3–4 (doc. no. 36).

11. The charge to the jury was as follows:

> The government has offered evidence tending to show that on different occasions the defendant engaged in conduct similar to the charges in the indictment. You have heard evidence tending to show that Mr. Ringwalt's personal expenses were deducted as corporate expenses resulting in incorrect corporate and personal returns for the years '92 and '93. The government argues that this was misconduct on the part of Charles Ringwalt and it is similar to the conduct charged in the indictment as happening April 1995 and 1996 as to the 1994 and 1995 tax years. Let me caution you that defendant is not on trial for committing any offense in 1993 or 1994 with respect to his 1992 and 1993 returns and that you may not consider the evidence about the 1992 and 1993 return as substitute for proof of the conduct charged in the indictment in later years. Nor may you consider this evidence as showing that Mr. Ringwalt had bad character. This evidence is admitted only for the limited purpose because the government contends it is evidence that the defendant acted knowingly and intentionally in filing the later returns and did not do it because of errors in accounting, mistake or other innocent reason. If you believe that the defendant committed some misconduct as to the 1992 and 1993 years you still need not draw any inference that he acted knowingly or intentionally with respect to the charged offenses in April of 1995 and April 1996. The government still bears the burden of proving willfulness as to the charges in the indictment. Apart from showing lack of mistake or accident or knowledge or intentionally [sic] conduct, the evidence of similar conduct may not be considered by you for any other reason and particularly not for the purpose of concluding that if Mr. Ringwalt was guilty of misconduct related to the 1992 and 1993 years he is therefore guilty of the charges for the years charged in the indictment.

Charge of the Court, Tr. Trans., 1/17/02, at 63–64.

tent and absence of mistake and common scheme or plan, that the probative value of the evidence substantially outweighed the danger of unfair prejudice to the defendant, and that an appropriate cautioning instruction was given to the jury.

2. *The admission of Ringwalt's extra-marital sexual relationship with a subordinate.*

■ The court also granted the government's motion *in limine* to admit evidence of defendant's adulterous affair with his secretary, Melanie Costa.[12] Defendant argues that this ruling was in error because it was uncontested that Melanie Costa signed expense checks and other false documents and had forged defendant's wife's signature on defendant's joint tax returns. According to the defendant, there was no justification for admitting proof of adultery to color these office activities which Costa did at the request of defendant. In addition, the defendant argues that because the government showed Costa's bias via her testimony that she was defendant's employee and friend for over 20 years and she felt loyal to him, the additional probative value of the sexual affair was substantially outweighed by the danger of unfair prejudice. Finally, the defendant contends that the court unduly minimized the prejudicial effect of the evidence of the affair. Tr. Trans., 1/7/02, at 30 (doubting whether the evidence would "inflame" the jury "to the degree that it would cloud the ability of the jury to see the defendant in light of the evidence."). Defendant argues that the evidence is extremely prejudicial because some members of the jury may have believed that a person who cheats on his wife also cheats on his taxes.

The government asserts, and the court agrees, that there are two reasons why the existence of the ongoing sexual relationship between Costa and defendant was admitted for a proper purpose. First, in order to defeat the defense claim that John Curran was responsible for the false tax returns that were filed by defendant and signed by both defendant and Costa (who forged defendant's wife's signature on the returns) and for the jury to understand how defendant's tax scheme continued for many years and in large volume, it was essential for the jury to understand the close nature of the relationship between Costa and defendant and why defendant trusted Costa to forge his wife's signature on tax returns and to handle his large cash advances and other personal expenses. The government argued at trial that not only was defendant incorrect in claiming that it was solely Curran's job to separate personal and business expenses, but that in fact, Costa had exclusive control, as per the defendant's directions, over the handling of defendant's personal financial affairs and corporate cash advances. It was important for the jury to know why Costa was entrusted with such duties. Evidence of parties' relationship with one another (including co-participation in uncharged criminal activity) has been held to be properly admitted to show familiarity amongst parties and their relationship of trust. *See, e.g., United States v. Gibbs*, 190 F.3d 188, 217–18 (3d Cir.1999) (in case involving conspiracy to deliver crack, evidence of a subsequent attempted homicide with which the defendant was not charged was admissible to show that conspiracy existed between the parties); *United States v. Traitz*, 871 F.2d 368, 369 (3d Cir.1989) (evidence of uncharged acts of violence went to shared tradition of violence and symbiotic relationship, and was properly admitted to show the background

---

12. Costa was called to testify as a government witness about the mechanics of the computer-generated and manual checks taken out of the 7550 account, the American Express account, the filing of tax returns, and general Stelwagon office activities.

of the charges, the parties' familiarity with one another and their concert of action); *United States v. O'Leary,* 739 F.2d 135, 136 (3d Cir.1984) (evidence of other crimes properly admitted for same purposes).

The court finds that the relationship between Costa and defendant was properly admitted to explain the nature of the relationship between the parties and to place in context the unique factual circumstances which explain why Costa—and not John Curran—assumed responsibility for preparing, booking and classifying the personal expenditures of the defendant as selling expenses of the company.

■ The second reason why the evidence was properly admitted is because the ongoing sexual affair between Costa and defendant gave Costa a personal stake in the outcome of the trial and was evidence of bias. Federal Rule of Evidence 607 provides that "[t]he credibility of a witness may be attacked by any party, including the party calling the witness." Fed.R.Evid. 607. "The partiality of the witness is subject to exploration at trial and is always relevant as discrediting the witness and affecting the weight of h[er]

testimony." *United States v. Carter,* 966 F.Supp. 336, 352 (E.D.Pa.1997) (quoting *Davis v. Alaska,* 415 U.S. 308, 316, 94 S.Ct. 1105, 39 L.Ed.2d 347 (1974)). Courts have found bias in a wide variety of situations, including familial or sexual relationships, employment or business relationships, friendships, common organizational memberships, and situations in which the witness has a litigation claim against another party or witness. *See* Weinstein's Federal Evidence §§ 607.04[5]–[7] (1997) (collecting cases).[13]

The court finds that the evidence was properly admitted to show bias. Because Costa's testimony on direct, cross and redirect contained many contradictions regarding her role in the business and her belief that it was Curran's job to separate business and personal expenses, the jury was entitled to know that Costa had a personal stake, beyond that of a loyal employee, in the outcome of the case as a result of her long-term and on-going sexual relationship with defendant. Furthermore, the court instructed the jury that the evidence of the affair was to be received for a very limited purpose.[14]

**13.** The government relies on *United States v. Willis,* 647 F.2d 54 (9th Cir.1981) where the court reversed a conviction, in part, where defendant was not allowed to show possible bias arising from the witness' sexual relationship with the defendant's former live-in girlfriend. Defendant argues that this case is not on point because the evidence did not relate to the defendant, rather to a witness, and was therefore less prejudicial. Defendant cites to *United States v. Lawrence,* 189 F.3d 838 (9th Cir.1999) where evidence of defendant's unconventional marriage, which included dating other women, was improperly admitted in a bankruptcy fraud trial. However, *Lawrence* is distinguishable because, there, the evidence was not in any way related to the alleged fraud nor did defendant's wife or the other women with whom he was involved testify. Thus, there was no assertion that the evidence was somehow probative of bias on the part of any witness or that the marriage or affairs

were somehow relevant to the case, unlike the instant case. Thus, neither *Willis* nor *Lawrence* provide insight here.

**14.** The court's charge was as follows:

The government has also offered evidence concerning the defendant's action in having a sexual affair with witness Melanie Costa and of regular high stakes gambling. Again, the defendant is not on trial for committing these other acts, not for committing acts not alleged in the indictment. Accordingly, you may not consider this evidence as a substitute for proof that the defendant committed the crimes charged. Nor may you consider the evidence as proof that the defendant has a criminal personality or bad character. The evidence of the sexual affair was admitted for the much more limited purpose as evidence which in the government's view tends to explain the

Lastly, the government did not make any remarks concerning the affair during its closing argument or otherwise emphasize the relationship during the trial. In fact, the only reference in the entire trial record to the sexual relationship between Costa and defendant is one brief set of questions and answers at the end of Costa's testimony.[15] Due to the limited scope of the evidence offered and its importance to negate the defense of mistake and reliance and to show bias, the court concludes its probative value was not substantially outweighed by the danger of unfair prejudice. Fed.R.Evid. 403.

### 3. *The admission of exhibit 489.*

■ Before trial commenced, defendant moved to exclude government exhibit 489, a calendar prepared by the defendant in September 1995 in connection with the City of Philadelphia examination of the 1994 returns. Defendant argued that because the calendar was created five months *after* his 1994 individual and corporate returns were filed, they could not show his state of mind at the time the 1994 returns were filed. The court rejected this argument, holding that even though the calendar was created after the filing of the 1994 return, it bears upon and is relevant to the offense because it involved defendant's after the fact attempt to cover up the inaccuracies in his 1994 return and the defendant's state of mind at the time of the filing of the 1995 returns. Tr. Trans., 1/9/08, at 2.

The court finds that the decision to allow the calendar into evidence was not error. The probative value of the calendar is substantial for the following reasons. First, it reflects defendant's willfulness and intent to evade taxes as it constitutes an attempt to conceal the true nature of the business expenses filed on his 1994 return and to evade the consequences of the City of Philadelphia's audit. False explanations or false exculpatory statements offered by defendants for prior fraudulent conduct is evidence of willfulness in criminal tax cases. *See United States v. Bishop,* 264 F.3d 535, 550 (5th Cir.2001) ("creating false invoices or documents" among conduct sufficient to support willful tax evasion); *United States v. Chesson,* 933 F.2d 298, 304 (5th Cir.1991) (defendants' "methods of . . . obliterating and altering addresses and purchase descriptions, and of destroying certain original invoices" could lead a reasonable jury to infer willfulness).

Second, the calendar is also relevant of the defendant's intent because it demonstrates that when confronted with the inaccuracies in his 1994 return, defendant did not take the position which he now asserts,

---

nature of the relationship, the reasons why Ms. Costa allegedly signed some of the tax returns at issue in this case and to show bias on her part as a witness. . . . Evidence of all of these acts may not be considered for you by any other purpose and you may not use as evidence to conclude that because the defendant committed these other acts he also must have committed the acts charged in the indictment.
Charge of the Court, Tr. Trans., 1/17/02, at 64–65.

**15.** That testimony was as follows:
Q: Ma'am, at some point in time, had your relationship with Mr. Ringwalt became more than just that of emloyer/employee?

A. Yes.
Q. Okay. And when was that?
A. In the early 90s.
Q. Okay. And can you just tell us briefly what the nature of your relationship was with him?
A. I have a personal relationship with him.
Q. Okay. And what type of personal relationship?
A. A personal, sexual relationship.
Q. Okay. And it that ongoing today, ma'am?
A. Yes, it is.
Tr. Trans., 1/10/02, at 98.

that the errors were attributable to Ray Mock or John Curran. Furthermore, the creation of the calendar pre-dates the signing and filing of defendant's 1995 tax return, an offense charged in the indictment. In this regard, the defense of innocent error as to the 1995 return is negated by evidence that the defendant continued to use the American Express and 7550 accounts for personal expenses in his 1995 tax return *after* the City of Philadelphia auditors had disallowed $814,000 as alleged business expenses. Thus, the court finds that the admission of the calendar at trial was proper.

4. *The restriction of defense expert witness' testimony regarding the professional responsibilities and lapses of John Curran, Controller of Stelwagon.*

■ During the trial, the court granted, in part, the government's motion to exclude the testimony of defendant's expert, Samuel Fisher, CPA. While permitting Fisher to offer his expert opinion on whether the outside accountant's conduct was consistent with generally accepted accounting principles, the court precluded Fisher from testifying regarding the alleged failure of John Curran to satisfy the controller's standard of care by failing to meet certain of his duties as controller of Stelwagon.

According to defendant, Mr. Fisher would have testified that Curran held himself out to be a competent and responsible controller and that he did not live up to the standards of performance of a controller based on Curran's experience and qualifications and the recommendations for the implementation of internal control at Stelwagon made to defendant by his accountants. Although Mr. Fisher could not identify any nationally recognized standard of care for controllers, defendant contends that Mr. Fisher's testimony would have been helpful to the jury in understanding complex issues. *See United States v. Morales*, 108 F.3d 1031 (9th Cir.1997) (where defendant's lack of bookkeeping competence was at issue, "bookkeeping principles and [defendant's] grasp of them—was clearly beyond the common knowledge of the average layperson.").[16]

Under Federal Rule of Evidence 702, the proponent of expert testimony must show that the expert is qualified, that the testimony is reliable, and that it will "fit" the facts of the case. *See Elcock v. K-mart Corp.*, 233 F.3d 734, 741 (3d Cir. 2000). Under Federal Rule of Evidence 703, the opinion must have a reasonable factual basis of the type relied upon by experts in the particular field. *See Stecyk v. Bell Helicopter Textron, Inc.*, 295 F.3d 408, 413–14 (3d Cir.2002).[17] Here, the court concluded that because the expert failed to identify a standard generically

16. The issue in *Morales* was whether the defendant's bookkeeping inaccuracies were intentional or the result of ignorance of bookkeeping procedures. The Ninth Circuit held that it was improper for the district court to completely exclude the testimony of a defense rebuttal expert witness as to the defendant's ability to understand bookkeeping where the government presented a number of witnesses who all testified that the defendant had a good knowledge of the subject. *Id.* at 1034.

The court finds that *Morales* is distinguished from the instant case because the expert testimony in *Morales* was essential to rebut direct testimony offered by the government on the identical issue. Here, in contrast, Fisher's proffer was contrary to and disregarded the trial evidence that John Curran did not possess the duties or responsibilities that Fisher claims he violated. Moreover, part of the Ninth Circuit's concern in reversing the district court in *Morales* was that the district court did not explain is reasoning for completely excluding the evidence. *Id.* at 1038. Here, the court carefully considered the arguments on this issue, heard a proffer from Mr. Fisher and articulated its reasons for limiting the testimony on the record.

17. Federal Rule of Evidence 703 states that "[t]he facts or data in the particular case upon which an expert bases an opinion or inference may be those perceived by or made

applicable to the job of controller and the issue regarding the terms of Curran's employment and his professional obligations and whether he satisfied those obligations was a factual issue and not a proper subject of expert testimony, the proposed expert opinion was inadmissable as lacking a reasonable factual basis. Tr. Trans., 1/16/02, at 90–91, 100.

Mr. Fisher intended to opine that the inaccuracies on the returns were the result of John Curran's failure to perform his professional duties as controller of Stelwagon as set forth in the internal control recommendations from Maillie Falconiero. The issue with respect to Curran was not what an ordinary controller's duties were or whether Curran had satisfied these standards. Rather, the issue was whether the defendant had explicitly placed limits on Curran's performance. To this end, outside the jury's presence, Mr. Fisher testified that he had no personal knowledge of the internal control recommendations made by Maillie Falconiero to the defendant, that he never discussed the rec-

ommendations with Stelwagon's accountants, that he did not know the content of any discussions between defendant and Curran concerning the implementation of the internal control recommendations, and never observed the operation of the Stelwagon accounting department or how the employees performed their duties. Because Mr. Fisher had no knowledge of Stelwagon's accounting practices, or of the control recommendations made by the outside accountants, or whether defendant or Curran decided which of the recommendations were to be implemented,[18] Mr. Fisher's opinion as to whether or not Curran breached any standard of care or failed to implement the recommendations was merely speculative and lacked a reasonable basis for its admission. *See Stecyk,* 295 F.3d at 420 (Sloviter, J. dissenting).[19] Thus, the court, after holding a hearing and receiving briefing and oral argument, properly and fairly exercised its discretion in limiting the scope of the expert testimony offered by the defendant as the Federal Rules of Evidence dictate.[20]

known to the expert at or before the hearing." Fed.R.Evid. 703.

**18.** The evidence at trial showed that Curran performed his job at defendant's direction. Although defendant's accountants supplied defendant with recommendations for internal controls, the evidence showed that it was up to the defendant, and not John Curran, to implement the recommendations. Curran had no power to force defendant to submit expense reports or account for his expenses. Specifically, with respect to the manual checks cashed by defendant and the American Express account that formed the basis of this prosecution, Curran played no role in and was specifically excluded from the preparation, posting, classification and payment of these amounts.

**19.** Furthermore, the court did not exclude all of the proposed expert testimony of Mr. Fisher. Despite government objections, Fisher was permitted to testify at trial and provide his conclusions to the jury as to the allegedly

irresponsible and unprofessional behavior of defendant's accountant with respect to defendant's tax returns.

**20.** Defendant also argues that in rejecting the expert testimony as to Curran's job, the court ignored defendant's Sixth Amendment right to compulsory process for obtaining witnesses. "The Compulsory Process clause protects the presentation of the defendant's case from unwarranted interference by the government, be it in the form of an unnecessary evidentiary rule, a prosecutor's misconduct, or an arbitrary ruling the by the trial judge." *Government of the Virgin Islands v. Mills,* 956 F.2d 443, 445 (3d Cir.1992). The defendant maintains that the subject of Curran's functions and responsibilities as controller, and whether he lived up to those responsibilities, would have helped the jury to understand the core issue in the case. Mr. Fisher was qualified to identify the standard of care applicable to Curran based on the responsibilities inherent in the controller position and the recommendations made by Maillie Falconiero.

### C. Defendant's Supplemental Post–Trial Motion for a New Trial.

Defendant seeks a new trial for the additional reasons that (1) the government suppressed evidence favorable to defendant and material to his defense, thereby violating his right to due process as set forth in *Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963); and (2) the government's failure to disclose the evidence coupled with its closing argument, which included facts not in evidence and was contrary to the undisclosed materials, constituted prosecutorial misconduct entitling defendant to a new trial. For the following reasons, the court finds that both arguments lack merit.

### 1. The Brady issue.

 Defendant's *Brady* argument centers on certain handwritten notes dated March 15, 2001 taken by Special Agent Shantelle Kitchen during an interview with an individual named Deborah McQuiston, which were produced to the defendant upon counsel's request on April 15, 2002, three months after trial. McQuiston performed part-time bookkeeping and accounting work for defendant and Stelwagon, for a limited time period in 1989–1990. The defendant argues that the McQuiston interview notes are exculpatory and material evidence which should have been turned over to the defense because the notes contradict the testimony of the government's key witness John Curran.

A valid *Brady* claim contains three elements: (1) the prosecution must suppress or withhold evidence,[21] (2) which is favorable, and (3) material to the defense. *United States v. Perdomo*, 929 F.2d 967, 970 (1991).[22] Evidence may be considered

---

Defendant's argument is unpersuasive. The issue here is not whether defendant was permitted to present expert testimony but, rather, the extent to which his expert would be permitted to offer testimony which did not conform with Federal Rules of Evidence 702 and 703. The court did permit Mr. Fisher to testify, but simply limited that testimony to that which had a reasonable factual basis.

**21.** This element applies whether the suppression of the evidence was purposeful or inadvertent. "[T]he prosecution is obligated to produce certain evidence actually or constructively in its possession." *United States v. Perdomo*, 929 F.2d 967, 970 (3d Cir.1991). The government does not contest this legal principle and concedes the fact that the McQuiston interview notes were in the government's constructive possession and "suppressed or withheld" from the defendant prior to trial.

**22.** The government argues that defendant's motion for a new trial based on *Brady* is barred because defendant failed to meet the requirements of Federal Rule of Criminal Procedure 33 which provides 7 days after verdict or a time fixed by the court within the 7 day period to file a motion for a new trial. However, "[a] motion for new trial based on newly discovered evidence may be made ... within three years after the verdict or finding of guilt." Fed.R.Crim.P. 33. The government argues that defendant does not qualify for the newly discovered evidence prong of Rule 33 because he fails to meet the five-part test applicable to a motion for a new trial on this basis. *See United States v. Adams*, 759 F.2d 1099, 1108 (3d Cir.1985) ("(a) the evidence must be in fact, newly discovered, *i.e.*, discovered since trial; (b) facts must be alleged from which the court may infer diligence on the part of the movant; (c) the evidence must be relied on, must not be merely cumulative or impeaching; (d) it must be material to the issues involved; and (e) it must be such, and of such nature, as that, on a new trial, the newly discovered evidence would probably produce an acquittal.").

However, the five part test generally applicable to a motion for a new trial is not strictly applicable where the basis of such a motion is exculpatory or impeachment evidence which was in the possession of the government. *See United States v. Bagley*, 473 U.S. 667, 680, 105 S.Ct. 3375, 87 L.Ed.2d 481 (1985) ("if the standard applied to the usual motion for a new trial based on newly discovered evidence were the same when the evidence was in the State's possession as when it was found in a neutral source, there would be no special significance to the prosecutor's obligation to serve the cause of justice.") (citation omitted);

exculpatory if it "goes to the heart of the defendant's guilt or innocence [or if it] might well alter the jury's judgment of the credibility of a crucial prosecution witness." *United States v. Starusko*, 729 F.2d 256, 260 (3d Cir.1984). Moreover, "evidence is 'material' under *Brady*, and the failure to disclose it justifies setting aside a conviction where there exists a 'reasonable probability' that had the evidence been disclosed the result at trial would have been different." *Wood v. Bartholomew*, 516 U.S. 1, 5, 116 S.Ct. 7, 133 L.Ed.2d 1 (1995) (per curiam) (quoting *Kyles v. Whitley*, 514 U.S. 419, 433, 115 S.Ct. 1555, 131 L.Ed.2d 490 (1995)). In *United States v. Bagley*, 473 U.S. 667, 675, 105 S.Ct. 3375, 87 L.Ed.2d 481 (1985), the Supreme Court advised:

> The *Brady* rule is based on the requirement of due process. Its purpose is not to displace the adversary system as the primary means by which truth is uncovered but to ensure that a miscarriage of justice does not occur. Thus, the prosecutor is not required to deliver his entire file to defense counsel, but only to disclose evidence favorable to the accused that, if suppressed, would deprive the defendant of a fair trial.

*Id.* (footnotes omitted).

The only evidence at trial concerning McQuiston was presented through John Curran, who testified as to his observations of the work performed by McQuiston:

> And they had an outside person that was—girl by the name of Debra McQuiston (ph.) was coming in a month-end closing transactions. And she at that time I knew was making some changes to the—some of the expenses and I believe some of them maybe reclassifying some of them and one of them was the American Express. I know Mr. Ringwalt just wasn't happy about some of the

changes and he told me that the American Express is business, that it should be left in there.

Tr. Trans., 1/11/02, at 34. On cross, Curran testified that he was not exactly certain of the adjustments that were being made by McQuiston. *Id.*, at 55 ("That's what she—that's what she would come in and make some adjustments but I didn't—I wasn't exactly sure what she was doing."). On redirect, he testified as follows:

> Q: And what was Mr. Ringwalt's reaction when Ms. McQuiston attempted to separate personal from business items on the American Express bills?
>
> A: Well, I know he wasn't happy about it, he was—at one point I remember him being annoyed that she made the change.
>
> Q: And how long did Ms. McQuiston actually work for this company?
>
> A: I don't know the exact length of time, she was there for about six months during the—after I was hired, I mean, I'm not sure how long she was there prior to that.

*Id.*, at 109–10. In its closing to the jury, government counsel made the following reference to the testimony of Curran concerning Deborah McQuiston:

> Mr. Curran knew [defendant] went off salary and so what did he do? In 1991,-'92, '93 he went to this man and he said, Mr. Ringwalt, and I'm sure he said it respectfully, if these are a substitute for payroll, then they should not be booked as selling expenses.
>
> That was probably a pretty frightening thing for Mr. Curran to do. He thought, as he told you, he'd be fired if he challenged Mr. Ringwalt. After all, what happened to Ms. McCristin [sic]?

*Perdomo*, 929 F.2d at 972 ("a defendant is not required to show that [*Brady*] evidence, if

disclosed, probably would have resulted in acquittal.").

Remember Ms. McCristin? [sic] You heard a lot of testimony about her. She had the audacity to go through this man's American Express bills while Mr. Curran was there and try to separate out business and personal. And what happened? Mr. Ringwalt got angry with her. John Curran was there. He's no dummy. He saw what Ms. McCristin [sic] fell out of favor with Mr. Ringwalt and she was gone within six months after Mr. Curran was there. Mr. Curran did what he was told.

*Id.,* at 13.

Special Agent Kitchen's notes of the McQuiston interview contain the following notations: "no conversations of business or personal expenses"; "Chuck never talked to her about income and expenses"; "possible reviewed AMEX; but not sure"; "never had any conversations about expenses"; "did not do tax return"; "no recollection of computerized checks or manual checks"; and "not much interaction w/ Curran; not there that long." With respect to the circumstances surrounding McQuiston's departure from Stelwagon, the notes are ambiguous and include reference such as: "stayed couple of months after he [John Curran] was hired left, had no authority"; "did not apply for job; no interest"; "wanted to keep independent CPA's—2 small kids at time—not interest"; and "John Curran took over her duties."

The defendant argues that these notes contradict the government's premise asserted in its closing argument that McQuiston had been fired because of her refusal to change the American Express entries, because, in fact, she had not been fired at all. However, the court finds that the defendant's argument is misguided for the following reasons.

First, the McQuiston interview notes are not *Brady* evidence because facts pertaining to Deborah McQuiston were known by or readily available to the defendant long before trial. It is well-settled that the government does not violate *Brady* by failing to disclose exculpatory or impeaching evidence that is available to the defense from other sources in the exercise of due diligence. *See, e.g., United States v. Hicks,* 848 F.2d 1, 4 (1st Cir.1988) (no *Brady* violation for failure to disclose grand jury testimony of potential witness not called to testify at trial because defense knew of and had access to witness and thus was "on notice of the essential facts required to enable him to take advantage of [the] exculpatory testimony") (citation omitted); *Lugo v. Munoz,* 682 F.2d 7, 9–10 (1st Cir.1982) (government has no *Brady* burden when facts are readily available to a diligent defender); *United States v. Zackson,* 6 F.3d 911, 918 (2d Cir.1993) ("Evidence is not 'suppressed' if the defendant either knew, or should have known, of the essential facts permitting him to take advantage of any exculpatory evidence."); *United States v. Perdomo,* 929 F.2d 967, 973 (3d Cir.1991) (dicta) ("Evidence is not considered suppressed if the defendant either knew or should have known of the essential facts permitting him to take advantage of any exculpatory evidence."); *United States v. Todd,* 920 F.2d 399, 405 (6th Cir.1990) (nondisclosure of possible exculpatory material does not violate *Brady* when the "defendant was aware of the essential facts that would enable him to take advantage of the exculpatory evidence."); *United States v. Romo,* 914 F.2d 889, 899 (7th Cir.1990) (when defense counsel knows about a witness with possible exculpatory information, and has an opportunity to subpoena that witness, prosecutor has no obligation to seek out and provide the information).[23]

**23.** Defendant argues that while he was aware of McQuiston, he was unaware that an interview with her had taken place prior to trial.

However, this distinction is irrelevant. The law is clear that *Brady* does not apply to

Here, McQuiston worked for the defendant and provided accounting and bookkeeping services to him in 1989–1990. The nature of the accounting work she performed for him and the reasons for her departure were therefore known firsthand by the defendant.[24] If defendant believed that the trial testimony of John Curran concerning his understanding of McQuiston's responsibilities at Stelwagon was somehow inconsistent with the true facts, then he could have called McQuiston as a trial witness to rebut the testimony of Curran. Thus, there is nothing in the interview notes that was not already known or knowable by the defendant through the exercise of reasonable diligence. To put it another way, there was no error in the government's failure to tell defendant that which he already knew.

 Secondly, the court finds that the McQuiston interview notes are not exculpatory. *Brady* only applies to exculpatory evidence. *See United States v. Nixon*, 881 F.2d 1305, 1308 (5th Cir.1989); *United States v. Kendall*, 766 F.2d 1426, 1440 (10th Cir.1985). As such, *Brady* does not apply to neutral evidence. *See United States v. Dillman*, 15 F.3d 384, 390 (5th Cir.1994) (grand jury testimony from witness who could not recall or remember alleged meeting was "neutral, not exculpatory or impeaching in nature," and thus not *Brady* material). Here, defendant's claim that the interview notes are exculpatory is that "had prior counsel had the interview notes of SA Kitchen before or even during trial, he could have shown that the Government's repeated assertions that Ms. McQuisten [sic] was relieved of her

duties because she would not participate in Mr. Ringwalt's alleged fraud was untrue and highly prejudicial to the defendant." Def.'s Supp. Mot. ¶ 22.

Defendant, however, misapprehends the purpose for which the McQuiston testimony was offered. Central to the defendant's theory at trial was Curran's credibility, *i.e.*, Curran was now trying to cover up his incompetence as a controller by blaming the defendant. The McQuiston testimony was offered by the government to explain why Curran went along with the defendant's directions which he claimed he knew at the time were improper, *i.e.*, he feared he would be fired if he did not, in part, because he believed McQuiston had been let go for complaining about the treatment of the American Express account. Tr. Trans., 1/11/02, at 34 ("I know Mr. Ringwalt just wasn't happy about some of the changes [McQuiston made] and he told me that the American Express is business...."). In light of these comments by the defendant and because McQuiston was only employed at Stelwagon for a short period of time, Curran came to understand that her early departure was the result of the defendant's displeasure with McQuiston's inquiries into the American Express account. In other words, the McQuiston evidence went to show why Curran did what he did, *i.e.*, fear of losing his job made him go along with the defendant's illegal scheme without much protestation. Properly understood, the notes would not have contradicted Curran's testimony because the notes do not go to Curran's state of mind, and, thus, if produced, the notes

---

evidence which defendant knew or should have known in the exercise of reasonable diligence. Here, defendant hired and supervised McQuiston and had firsthand knowledge of the circumstances surrounding her employment and departure from Stelwagon. The fact that what the defendant knew was now reduced to a piece of paper is not controlling.

**24.** According to the government, consistent with the fact that defendant was McQuiston's employer and supervisor, defendant referred to McQuiston on at least three unprompted occasions during his April 29, 1993 deposition, taken during the defendant's lawsuit against his former return preparers.

would have been neither exculpatory nor impeaching of Curran.

Lastly, the court finds that the McQuiston interview notes are not material and would not have changed the outcome of the trial. The standard of materiality that applies to the government's non-production of alleged *Brady* information is whether "the omitted evidence creates a reasonable doubt that did not otherwise exist." *United States v. Hill* 976 F.2d 132, 135 (3d Cir.1992) (quoting *United States v. Agurs*, 427 U.S. 97, 109–10, 96 S.Ct. 2392, 49 L.Ed.2d 342 (1976)). In order to demonstrate a reasonable probability of a different outcome, the defendant must show "the favorable evidence [withheld] could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict." *Kyles v. Whitley*, 514 U.S. 419, 420, 115 S.Ct. 1555, 131 L.Ed.2d 490 (1995). However, in making this determination, the assessment of the omitted evidence's impact must take account of the cumulative effect of the suppressed evidence in light of the other evidence, not merely the probative value of the suppressed evidence standing alone. *Id.* at 436–37, 115 S.Ct. 1555. In *United States v. Pelullo*, 14 F.3d 881 (3d Cir.1994), it was discovered after trial that an IRS interview memorandum of a key government witness, setting forth facts inconsistent with the trial testimony of the witness, particularly with respect to when and where the witness met two co-defendants, was not produced. *Id.* at 886. The court stated that a reversal is warranted only when the suppression of the *Brady* evidence "undermines confidence in the outcome of the trial" and held that the fact of some inconsistencies between the trial testimony and the interview report concerning the witness was "merely cumulative and impeaching" and would not have changed the outcome of the trial. *Id. See also United States v. Adams*, 759 F.2d 1099, 1108 (3d Cir.1985) (information regarding witness' participation in robbery not material where other evidence more than sufficient for finding of guilt).

Similarly, here, as explained above, there was strong evidence of defendant's willful and long standing tax evasion scheme, which continued for five years after McQuiston's employment at Stelwagon ended, presented to the jury at trial. *See* Part A, *supra*. In light of this evidence, the court finds that even if the government had produced the interview notes and assuming defendant had called McQuiston to testify as to her work at Stelwagon and her departure from the company, it cannot be said that a reasonable probability exists that the outcome of the trial would have been different.

### 2. *Prosecutorial Misconduct.*

The defendant also argues, based on the McQuiston notes, that the government committed prosecutorial misconduct which deprived defendant of his Fifth Amendment right to due process by arguing facts about Deborah McQuiston in its closing which were not in evidence and which were contradicted by the non-disclosed McQuiston interview notes in the government's constructive possession. The defendant's argument is twofold: one, part of the government's closing argument was not supported by evidence on the record, and, two, it was contrary to the statements made by McQuiston in the interview notes taken by Special Agent Kitchen, which were not disclosed to the defendant.

When a defendant seeks a new trial based on allegedly improper arguments of government counsel, the focus of the inquiry is whether any remarks by the prosecutor "unfairly prejudiced the defendant." *United States v. Young*, 470 U.S. 1, 12, 105 S.Ct. 1038, 84 L.Ed.2d 1 (1985). The Third Circuit has described the test as follows:

In determining prejudice, we consider the scope of the objectionable comments and their relationship to the entire proceeding, the ameliorative effect of any curative instructions given, and the strength of the evidence supporting the defendant's conviction. As the Supreme Court has emphasized, "a criminal conviction is not to be lightly overturned on the basis of a prosecutor's comments standing alone, for the statements or conduct must be viewed in context." *United States v. Young*, 470 U.S. at 11, 105 S.Ct. 1038 (finding harmless error where the prosecutor had stated his opinion that the defendant was guilty and urged the jury to "do its job."). *United States v. Zehrbach*, 47 F.3d 1252, 1265 (3d Cir.1995).

Here, government counsel referenced McQuiston in its closing in the context of explaining Curran's state of mind and why Curran did what he testified he was told to do by the defendant. Again, government counsel argued:

> Mr. Curran knew [defendant] went off salary and so what did he do? In 1991,-'92, '93 he went to this man and he said, Mr. Ringwalt, and I'm sure he said it respectfully, if these are a substitute for payroll, then they should not be booked as selling expenses.
>
> That was probably a pretty frightening thing for Mr. Curran to do. He thought, as he told you, he'd be fired if he challenged Mr. Ringwalt. After all, what happened to Ms. McCristin [sic]? Remember Ms. McCristin? [sic] You

heard a lot of testimony about her. She had the audacity to go through this man's American Express bills while Mr. Curran was there and try to separate out business and personal. And what happened? Mr. Ringwalt got angry with her. John Curran was there. He's no dummy. He saw what Ms. McCristin [sic] fell out of favor with Mr. Ringwalt and she was gone within six months after Mr. Curran was there. Mr. Curran did what he was told.

Tr. Trans., 1/17/02, at 13. John Curran had testified that he believed that McQuiston had made some changes to the American Express account and that defendant was unhappy about the changes that she made and that she left the company within six months. *Id.*, 1/11/02, at 34 ("I know Mr. Ringwalt just he wasn't happy about some of the changes and he told me that the American Express is business, that is should be left there."). On redirect, Curran reiterated that defendant was annoyed by McQuiston's conduct and further stated that she left the company six months after he was hired. *Id.* at 109–10.

As to defendant's first argument that the closing was not supported by the evidence, the court finds that the government's closing argument with respect to Curran's state of mind and beliefs regarding defendant's relationship with McQuiston and what had happened to McQuiston for pointing out defendant's failure to separate out the American Express account comports with the trial testimony. Thus, the government's closing argument in this regard was not error.[25]

---

**25.** The defendant never objected to this argument during closing. Accordingly, this issue should be decided under the Rule 52(b) of the Federal Rules of Criminal Procedure which states that "[p]lain errors or defects affecting substantial rights may be noticed although they were not brought to the attention of the court." Under the plain error standard, "there must be (1) an error; (2) which is clear or obvious; and (3) which affects substantial rights (i.e., it affected the outcome of the

district court proceedings)." *See United States v. Navarro*, 145 F.3d 580, 584 (3d Cir. 1998) (citing *United States v. Olano*, 507 U.S. 725, 733–34, 113 S.Ct. 1770, 123 L.Ed.2d 508 (1993)). If these three requirements of Rule 52(b) are satisfied, the court has discretion to notice a plain error which "(a) causes the conviction or sentencing of an actually innocent defendant, or (b) seriously affect[s] the fairness integrity or public reputation of judi-

■ However, as to defendant's second argument that the closing was contrary to the undisclosed interview notes, to the extent that government counsel suggested in its closing that not only did Curran *believe* that McQuiston was fired for her conduct concerning the American Express account, but that the evidence reflected that *in fact* McQuiston was fired by defendant for separating out the American Express account,[26] that portion of the closing was not supported by the trial testimony. Moreover, such argument was contrary to the interview notes of which the government had constructive knowledge and had been withheld from the defendant. *See* McQuiston Interview Notes ("possible reviewed AMEX; but not sure," "never had conversations about expenses," "Chuck never talked to her about income and expenses," "did not apply for job; no interest," and "wanted to keep independent CPA's—2 small kids at time—not interest."). Viewed in this light, the issue is whether the failure to disclose the McQuiston interview notes together with the reference in the closing to facts contrary to the McQuiston interview notes "unfairly prejudiced the defendant." *Young*, 470 U.S. at 12, 105 S.Ct. 1038. The court concludes for the reasons that follow that they did not.

As set forth above, the government produced at trial a compelling amount of evidence of the defendant's criminal intent, including evidence of a consistent multi-year pattern by the defendant of extracting millions of dollars from his corporation through false bookings and cashed manual checks which became the functional equivalent of payroll checks which the defendant had stopped giving himself. The evidence also included inculpatory admissions by the defendant and his manufacturing of a phony calendar, prepared for the purpose of explaining away the booking of personal expenses as business expenses during an audit for the 1994 tax year by the City of Philadelphia and before the defendant continued the identical scheme into 1995. In light of all this evidence, described in detail to the jury by the government during closing argument, the court finds that the references made by government counsel about McQuiston, which went beyond the context of Curran's state of mind, were marginal in their import and their impact and, thus, did not unfairly prejudice the defendant.

Furthermore, the court finds that there is no reasonable probability that government counsel's overreaching comments during its closing argument changed the outcome of these proceedings. Because the alleged prosecutorial misconduct here involves the failure to disclose evidence, the *Brady* standard of materiality is instructive. In order to demonstrate a reasonable probability of a different outcome, the defendant must show "the favorable evidence [withheld] could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict." *Kyles v. Whitley*, 514 U.S. 419, 420, 115 S.Ct. 1555, 131 L.Ed.2d 490. Again, based on the breadth of evidence the government produced at trial on the issue of defendant's intent, the court finds that government counsel's statements regarding McQuiston, which were contrary to the McQuiston interview notes, do not undermine confidence in the verdict or affect the fairness of the proceedings.

cial proceedings." *Navarro*, 145 F.3d at 585 (citing *Olano*, 507 U.S. at 735–36, 113 S.Ct. 1770).

However, here, because the court finds that there was no error, further analysis under Rule 52(b) is unnecessary.

**26.** *I.e.*, "Remember Ms. McCristin [sic]? You heard a lot of testimony about her. She had the audacity to go through this man's American Express bills.... And what happened? Mr. Ringwalt got angry with her." *Id.*, 1/17/02, at 13.

Lastly, the court finds that any error by the government does not undermine confidence in the criminal justice system. Prosecutorial misconduct, albeit error, "does not always warrant the granting of a mistrial. The Supreme Court has recognized that given 'the reality of the human fallibility of the participants, there can be no such thing as an error-free, perfect trial, and that the Constitution does not guarantee such a trial.'" *Zehrbach,* 47 F.3d at 1265 (quoting *United States v. Hasting,* 461 U.S. 499, 508–09, 103 S.Ct. 1974, 76 L.Ed.2d 96 (1983)). Furthermore, "a criminal conviction is not to be lightly overturned on the basis of a prosecutor's comments standing alone, for the statements or conduct must be viewed in context; only by doing so can it be determined whether the prosecutor's conduct affected the fairness of the trial." *Young,* 470 U.S. at 11, 105 S.Ct. 1038.

Here, the government's error does not undermine the confidence in the criminal justice system. First, while the McQuiston interview notes were in the government's *constructive* possession, they were not in the *actual* possession of government trial counsel.[27] Thus, while the government's failure to disclose the notes prior to trial combined with the limited reference in the closing argument was not proper, that conduct of government's counsel can not be described as intentional or constituting bad faith. Second, the scope of the government's error is minimal. Viewing the contested portion of the government's closing as a whole, *see* p. 45, *supra,* the heart of the argument pertains to Curran's state of mind about how Curran viewed the relationship between defendant and McQuiston and why he went along with defendant's scheme—information which is not contradicted by the interview notes. Thus, the government's misconduct was both limited and inadvertent.

The court finds that to the extent the government's closing argument technically could be characterized as prosecutorial misconduct it did not unfairly prejudice the defendant, affect the integrity of the proceedings or undermine the confidence of the public in the criminal justice system.[28] Thus, the defendant's motion for a

---

**27.** Although the interview notes of McQuiston were taken by Special Agent Kitchen, the prosecutors were unaware of the existence of the notes until after the trial in this case.

**28.** Defendant's reliance on *United States v. Mastrangelo,* 172 F.3d 288 (3d Cir.1999) is misplaced. There, the government and defendant entered into a stipulation stating that defendant "had the chemical background to know the ingredients and equipment necessary to make methamphetamine." *Id.* at 295. In its closing, the government repeatedly misrepresented the stipulation and stated that defendant had knew how to make methamphetamine and that there was no evidence that anyone else in the conspiracy had similar knowledge. *Id.* at 296. Despite the defendant's objection and an attempted curative instruction, on rebuttal, the prosecutor made an additional misrepresentation. *Id.* at 297. The court held that these errors constituted prosecutorial misconduct requiring a new trial. The court reasoned:

The impropriety of these statements is evident. They distort the substance of the Stipulation, inflating the limited stipulation that [defendant] had the chemical background to know the ingredients and equipment necessary to make methamphetamine to encompass a meaning that ... that because of his knowledge of the ingredients and equipment needed, [defendant] knew how to make methamphetamine. Furthermore, the prosecutor's statement that there was no evidence that anyone else had similar knowledge impermissibly shifted the burden of proof to [defendant] to demonstrate that one of the other conspirators knew how to make methamphetamine.

\* \* \* \* \* \*

The prosecution sought to have the jury infer that [defendant] ... turned the ingredients into methamphetamine, but it had no evidence, direct or indirect, of that fact. If the prosecutor could convince the jury that [defendant] was the only conspirator who knew how to make methamphetamine, the

new trial on this ground will be denied.

### CONCLUSION

The defendant's motion for judgment of acquittal will be denied because the court finds that the evidence presented at trial was sufficient to support the jury's verdict of guilty as to all counts charged in the indictment. Furthermore, for the reasons stated above, the defendant has not cited to a trial error entitling him to a new trial nor has defendant shown that he has been deprived of his Fifth Amendment right to due process because of a *Brady* violation, and to the extent that the government's closing is characterized as prosecutorial misconduct, it is not reversible error. Thus, defendant's motions for a new trial will be denied.

An appropriate order follows.

### ORDER

**AND NOW,** this 31st day of **July, 2002,** upon consideration of defendant's post-trial motions and pursuant to the court's memorandum dated July 31, 2002, it is hereby **ORDERED** that:

1. Defendant's Motion for Judgment of Acquittal (doc. no. 64) is **DENIED;**

2. Defendant's Motion for a New Trial (doc. no. 65) is **DENIED;**

3. Defendant's Motion to Withdraw Original Supplemental Post–Trial Motion (doc. no. 112–1) is **GRANTED;**[1]

4. Defendant's Additional Supplemental Post–Trial Motion (doc. no. 112–2) is **DENIED.**

**AND IT IS SO ORDERED.**

---

jury might reasonably draw that inference. However, there was no evidence that [defendant] knew how to make methamphetamine, and it was highly improper ... to shift the meaning of the Stipulation to fill that missing link.

*Id.* at 296, 298.

*Mastrangelo* is distinguishable. There, the government clearly made repeated argument based on facts which were not only not in evidence, but dealt with facts to which defendant himself stipulated. Furthermore, the is-

sue in *Mastrangelo* went to the heart of the government's case and placed upon the defendant an improper burden to prove knowledge on the part of his co-conspirators. None of these factors are present here. As described above, the government's closing was not contradicted by the interview notes, and, the issue with respect to McQuiston did not go to the heart of the case against the defendant.

1. Defendant's Supplemental Post–Trial Motion (doc. no. 97) is **WITHDRAWN.**